IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| | : |
| LATECHIA CHAMBERS, et al. | |
| | : |
| v. | : Civil Action No. DKC 13-2347 |
| | : |
| KING BUICK GMC, LLC, et al. | |
| | : |

**MEMORANDUM OPINION**

Numerous motions are pending and ready for resolution in this putative class action civil RICO case, including: (1) a motion to dismiss the federal claims or to abstain filed by Defendants King Auto of Silver Spring LLC; King Buick GMC, LLC ("King Buick GMC"); King Hagerstown Motors LLC; King Lincoln, Inc.; King Vehicles, LLC; and King Volkswagen, LLC (ECF No. 34); (2) a separate motion filed by King Buick GMC, LLC to dismiss the claims in Counts I through VII of the amended complaint (ECF No. 36); (3) a motion to dismiss or, in the alternative, for summary judgment on Counts I through VII, filed by King Auto of Silver Spring, LLC; King Hagerstown Motors LLC; King Lincoln, Inc.; King Vehicles, LLC; and King Volkswagen, LLC (ECF No. 37); (4) a motion to consolidate cases filed by Plaintiff Latechia Chambers (ECF No. 63); (5) a motion for leave to file surreply and supplemental Rule 56(d) Declaration filed by Plaintiff (ECF No. 68); and (6) a motion to strike three notices of

supplemental authority filed by Defendants (ECF No. 73).   The issues have been fully briefed, and the court now rules, no hearing being deemed necessary.   Local Rule 105.6.   For the following reasons, Defendants' motion to dismiss federal claims or to abstain will be granted in part.   King Buick GMC's motion to dismiss will be granted in part, and the other Defendants' motion to dismiss or for summary judgment will be granted. Plaintiff's motion for leave to file surreply and supplemental Rule 56(d) Affidavit and motion to consolidate cases will be denied.   Defendants' motion to strike Plaintiff's notices of supplemental authority will be denied.

## I.   Background

This case traces its origin to March 17, 2011 and February 18, 2012, when Comfort Kaakyire and Latechia Chambers purchased, respectively, a used 2008 Saturn Outlook and 2010 Dodge Caliber from King Buick GMC.   (ECF No. 22 ¶ 18).   Ms. Kaakyire and Ms. Chambers each executed a Buyer's Order with King Buick GMC, which did not indicate that these vehicles were prior short-term rentals.   (*See* ECF No. 22-2).   Ms. Kaakyire instituted a putative class action lawsuit in the Circuit Court for Howard County on January 13, 2013, and later transferred the case to the Circuit Court for Montgomery County.   On May 14, 2013, Ms. Kaakyire filed a first amended class action complaint in the Circuit Court for Montgomery County, on behalf of herself and a

class of similarly situated consumers, alleging violations of
COMAR 11.12.01.14(M)(1) due to King Buick GMC's failure to
disclose the prior use of sold vehicles as short-term rental
vehicles. This provision governs disclosure of former vehicle
use:

> (1) Vehicles formerly used for a purpose
> other than a consumer good shall be clearly
> and conspicuously identified as to their
> former use. This includes, but is not
> limited to, vehicles formerly used:
>
> . . .
>
> (f) As short-term rental vehicles.

COMAR 11.12.01.14(M)(1)(f).

On August 2, 2013, Ms. Kaakyire's counsel filed a notice of
voluntary dismissal in the state court action, and subsequently
filed a class action complaint in this court on August 12, 2013
against the following Defendants: King Buick GMC; and King
Lincoln, Inc., King Auto of Silver Spring, LLC, King Vehicles,
LLC, King Hagerstown Motors LLC, and King Volkswagen, LLC ("the
Other Dealer Defendants"). (ECF No. 1). The Defendants filed
separate motions to dismiss, but before the motions were
adjudicated, Plaintiff filed an amended complaint on October 17,
2013, adding Latechia Chambers as a Named Plaintiff. (ECF No.
22). On October 22, 2013, Defendants tendered a Rule 68 Offer
of Judgment to Ms. Kaakyire, which she accepted. (ECF No. 24).
On December 13, 2013, the undersigned entered judgment against

Defendants as to Ms. Kaakyire's claims, and she was dismissed from the lawsuit. (ECF No. 45). Thus, Latechia Chambers remains the only putative Named Plaintiff here.[1]

The amended complaint by Ms. Chambers against all of the Defendants states that Defendants misrepresented the prior short-term rental use of the vehicles sold to Plaintiff and members of the putative class in a pre-printed space on the Buyer's Order specifically designed for the disclosure of this information. Although Defendants argue that Plaintiff was provided with a CarFax Report that revealed that the vehicle was a prior short-term rental, there is a dispute about whether the CarFax Report was provided to Plaintiff before she executed the purchase documents and whether Plaintiff initialed the CarFax Report as Defendants indicate. (*See* ECF No. 34-5, at 2).[2] Plaintiff alleges that Defendants failed to disclose to her and members of the class "clearly and conspicuously" that the vehicles they purchased were previously used as short-term

---

[1] Ms. Chambers will be referred to as "Plaintiff" throughout the memorandum opinion.

[2] Defendants include as an exhibit to their motion to dismiss a copy of the Carfax Report for the 2010 Dodge Caliber that Plaintiff purchased. In this document, the fact that this car was a prior rental is shown as highlighted and Ms. Chambers appears to have initialed the CarFax Report. (*See* ECF No. 34-5, at 2). Ms. Chambers declares in an affidavit, however, that she does "not recall anyone at the dealership showing her a Carfax report or asking her to sign or initial it." (*See* ECF No. 48-2, at 33). She cannot verify whether the initials are hers.

rentals in violation of Maryland law.  The amended complaint states:

> [a]s the Maryland Motor Vehicle Administration ("MVA") recognized when it enacted COMAR regulations requiring disclosure of prior short-term rental use, [] buyers seek to avoid vehicles used for short-term rentals because of the perception and expectation that these vehicles are driven hard by drivers who care little about them, may not have been well or consistently maintained, and more often are involved in accidents than vehicles uses for personal, family, and household purposes.

(ECF No. 22 ¶ 3).  In Plaintiff's view, this omission was intentional and part of a fraudulent scheme by King Buick and the Other Dealer Defendants - to whom she refers collectively as the "King Auto Group" - of selling used short-term rental cars without disclosing their origins in the Buyer's Order or elsewhere clearly and conspicuously.  Plaintiff asserts that Defendants consistently failed to make the requisite disclosures before consummating the sale transactions with car purchasers. COMAR 11.12.01.14(A)(2) defines "clear and conspicuous" as:

> a statement, representation, or term different from other statements, representations or terms being made so as to be readily noticeable to the person to whom it is being disclosed either by its size, sound, length of time, color, placement in the advertisement, or the like.

Plaintiff maintains that "Defendants deliberately designed their standard sales agreements in a manner calculated to not draw

attention to any disclosure of prior rental or other commercial use." (ECF No. 22 ¶ 36).

Plaintiff asserts that the King Auto Group Defendants are all separately incorporated businesses that associate together as "King Auto Group," as an association-in-fact, although there is no formal, legal entity with that name. These dealerships jointly market and sell vehicles and develop form documents such as the Buyer's Orders used at each dealership. Plaintiff asserts:

> Defendants have an agreement to work together to market and sell used vehicles and actively are doing so. Defendants' cross-marketing and commingling and/or sharing of inventory and Carfax reports is evidence of their cooperation, joint agreements, and use of common procedures and documents to unlawfully sell such used vehicles without the disclosure required by Maryland law.

(ECF No. 22 ¶ 49). Plaintiff believes that all of the Defendants conspired to market and sell used vehicles without disclosing to consumers that the vehicles were previously used as short-term rentals. (*Id.* ¶ 45). Plaintiff states that Defendants King Lincoln, Inc. and King Vehicles, Inc. did not sell prior short-term rental vehicles in their own name but routinely sold these vehicles through "their King Auto Group co-conspirators - King Buick, King Volkswagen, LLC, King Hagerstown

Motors, LLC or King Auto of Silver Spring, LLC." (*Id.* ¶ 44). Plaintiff further contends:

> [a]s part of its scheme to mislead customers into believing that vehicles used for prior short-term rentals were never put to such use, King Auto Group dealerships further agreed to employ, and from time to time did employ, a form entitled "Disclosure of Prior Vehicle Use for Dealership or Commercial Purposes[.]" [] This form . . . is provided to buyers *only* after they have signed the sales agreement and thus become legally bound to purchase a vehicle, does not provide the "clear and conspicuous" disclosure of prior non-consumer use required by law.

(*Id.* ¶ 39). The amended complaint identifies fifteen additional vehicle sale transactions over a two-year period in which Defendants King Volkswagen LLC, King Hagerstown Motors, LLC, and King Auto of Silver Spring, LLC allegedly perpetrated the same fraudulent scheme to induce consumers into purchasing prior short-term rental vehicles. (*Id.* ¶ 43). Plaintiff alleges that she paid significantly more for her vehicle than it was worth and was overcharged as a result of the scheme.

The amended complaint asserts the following counts: implied warranty of merchantability (count I); violations of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301, *et seq.* (count II) and the Maryland Consumer Protect Act ("MCPA") (count III); deceit by non-disclosure or concealment (count IV); unjust enrichment (count V); negligent misrepresentation (Count VI);

breach of contract (count VII); and violations of the Federal Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(a),(c), and (d) (counts VIII, IX, and X). Defendants filed separate motions to dismiss. All of the Defendants filed a motion to dismiss the federal claims (RICO and the MMWA) or, in the alternative, for abstention (ECF No. 34). King Buick GMC filed a separate motion to dismiss addressing the non-RICO claims. (ECF No. 36). The Other Dealer Defendants filed a separate motion to dismiss or for summary judgment on the non-RICO claims. (ECF No. 37). All the motions have been fully briefed.[3] On April 18, 2014, Plaintiff moved for leave to file a surreply and submit a supplemental Rule 56(d) Affidavit. (ECF No. 68). Plaintiff also moved to consolidate this matter with another putative class action against the same Defendants pending before the undersigned. (See ECF No. 63). Plaintiff filed multiple notices of supplemental authority (ECF Nos. 50, 64, 71, 76). Defendants moved to strike these notices, deeming them as impermissible surreplies. (ECF No. 73).[4]

---

[3] On October 18, 2013, Plaintiff filed a motion to certify the class, but requested that this motion be held in abeyance pending adjudication of Defendants' motion to dismiss. (ECF No. 23). The undersigned issued a paperless order on November 4, 2013, holding the motion for class certification in abeyance. (ECF No. 31).

[4] Plaintiff has filed four notices of supplemental authority. (ECF Nos. 50, 64, 71, 76). Defendants argue that these notices of supplemental authority are improper because

## II.   Standards of Review

### A.   Motion to Dismiss

All of the Defendants move to dismiss Plaintiff's RICO claims.  King Buick GMC also filed a separate motion to dismiss the non-RICO claims.   A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).  A plaintiff's complaint need only satisfy the standard of Rule 8(a), which requires a "short and plain statement of the claims showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).  "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

---

they actually are surreplies consisting of addition arguments to support Plaintiff's opposition to Defendants' motions and concern non-binding authority.   Defendants dispute the applicability of the cases Plaintiff submitted as supplemental authority to the instant dispute and reargue the merits of their own position.   Granting Defendants' motion to strike would not preclude the court from applying any existing precedent or considering any other authority.   *See Carter v. Astrue*, Civ. Action No. CBD-11-2980, 2013 WL 4461579, at *3 (D.Md. Aug. 19, 2013) (denying motion to strike notice of supplemental authority).   Defendants' motion to strike will be denied.

At this stage, the court must consider all well-pleaded allegations in a complaint as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff, *see Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (*citing Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)).  In evaluating the complaint, the court need not accept unsupported legal allegations.  *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989).  Nor must it agree with legal conclusions couched as factual allegations, *Iqbal*, 556 U.S. at 678, or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.2d 186, 193 (4th Cir. 2009).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n] . . . that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)).  Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.*

Moreover, allegations of fraud – which Plaintiff raises in both her RICO and state law claims – are subject to a heightened

pleading standard under Rule 9(b).  *Harrison*, 176 F.3d at 783.
Rule 9(b) states that "in alleging a fraud or mistake, a party
must state with particularity the circumstances constituting the
fraud or mistake.   Malice, intent, knowledge, and other
conditions of a person's mind may be alleged generally."   Such
allegations typically "include the 'time, place and contents of
the false representation, as well as the identity of the person
making the misrepresentation and what [was] obtained thereby.'"
*Superior Bank, F.S.B. v. Tandem Nat'l Mortg., Inc.*, 197
F.Supp.2d 298, 313–14 (D.Md. 2000) (*quoting Windsor Assocs.,
Inc. v. Greenfeld*, 564 F.Supp. 273, 280 (D.Md. 1983)).   In cases
involving concealment or omissions of material facts, however,
meeting Rule 9(b)'s particularity requirement will likely take a
different form.   *See Shaw v. Brown & Williamson Tobacco Corp.*,
973 F.Supp. 539, 552 (D.Md. 1997) (recognizing that an omission
likely "cannot be described in terms of the time, place, and
contents of the misrepresentation or the identity of the person
making the misrepresentation" (internal quotations omitted)).
The purposes of Rule 9(b) are to provide the defendant with
sufficient notice of the basis for the plaintiff's claim, to
protect the defendant against frivolous suits, to eliminate
fraud actions where all of the facts are learned only after
discovery, and to safeguard the defendant's reputation.   *See*
*Harrison*, 176 F.3d at 784.   In keeping with these objectives,

11

"[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant[s were] made aware of the particular circumstances for which [they] will have to prepare a defense at trial and (2) that [the] plaintiff has substantial prediscovery evidence of those facts." *Id.*

### B. Summary Judgment Standard

The Other Dealer Defendants move to dismiss or, in the alternative, for summary judgment on the non-RICO counts. Summary judgment may be entered only if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (*quoting* former Fed.R.Civ.P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment."

12

*Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).   "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."   *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted).   At the same time, the facts that are presented must be construed in the light most favorable to the party opposing the motion.   *Scott v. Harris*, 550 U.S. 372, 278 (2007); *Emmett*, 532 F.3d at 297.

## III. Analysis

### A.  RICO Claims

Plaintiff asserts three claims for racketeering pursuant to RICO's civil provision, 18 U.S.C. § 1964, which provides a cause of action to "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]."[5]

---

[5] Although the Other Dealer Defendants have raised standing as an issue in their motion to dismiss or, in the alternative, for summary judgment on the non-RICO claims, they have not briefed the argument that Plaintiff lacks standing to assert RICO claims against them in the motion to dismiss the federal claims.  The sole mention of standing in Defendants' motion to dismiss the RICO counts is that Plaintiff lacks standing "to assert RICO claims against the Unrelated Defendants because they do not owe any legal duty to [her]."  (ECF No. 34-1, at 6). Plaintiff need not allege that the Other Dealer Defendants owed a legal duty to Ms. Chambers in order to state a civil RICO claim, however.  Furthermore, although King Buick GMC joins the Other Dealer Defendants in their motion to dismiss the RICO claims, the arguments made in the brief largely concern Plaintiff's failure to plead a civil RICO case against the Other Dealer Defendants, not King Buick GMC.

Plaintiff alleges that all Defendants violated Section 1962(a),
(c), and (d).[6]

In order for a civil RICO claim to survive a Rule 12(b)(6)
motion to dismiss, plaintiff must allege "(1) conduct; (2) of an
enterprise; (3) through a pattern; (4) of racketeering."
*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).
Plaintiff must additionally plead proximate cause, that is she
was injured in her business or property "by reason of" the RICO
violation. *Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S.
1, 6 (2010). Defendants argue that Plaintiff has failed to
allege: (1) a RICO enterprise separate and distinct from the

---

[6] In relevant part, Title 18, Section 1962 states:

> (a) It shall be unlawful for any person who
> has received any income derived, directly or
> indirectly, from a pattern of racketeering
> activity . . . to use or invest, directly or
> indirectly, any part of such income, or the
> proceeds of such income, in acquisition of
> any interest in, or the establishment or
> operation of, any enterprise which is
> engaged in, or the activities of which
> affect, interstate or foreign commerce.

> (c) It shall be unlawful for any person
> employed by or associated with any
> enterprise engaged in, or the activities of
> which affect, interstate or foreign
> commerce, to conduct or participate,
> directly or indirectly, in the conduct of
> such enterprise's affairs through a pattern
> of racketeering activity.

> (d) It shall be unlawful for any person to
> conspire to violate any of the provisions of
> subsection (a), (b), or (c) of this section.

persons as required by Section 1962(c); (2) a RICO enterprise separate and apart from the pattern of racketeering activity; (3) predicate acts of racketeering; (4) a pattern of racketeering activity; (5) effect on interstate commerce; (6) as to the Section 1962(a) claim, investment of proceeds from racketeering activity; and (7) as to the Section 1962(d) claim, lack of a conspiracy because there was no underlying RICO violation.[7]

---

[7] Defendants argue that Plaintiff's claims are routine allegations of state tort law beyond the intended scope of the RICO statute. (ECF No. 34-1, at 17-18).  Citing *HMK Corp. v. Walsey*, 828 F.2d 1071 (4th Cir. 1987), Defendants assert that Plaintiff attempts to turn her dispute "over application of the MVA and COMAR regulations into a claim of ongoing criminal activity[, which] would convert ordinary contract claims into RICO actions and this is what the Fourth Circuit forbids." (ECF No. 34-1, at 18).  *Walsey* involved alleged misconduct of developers in a land use dispute and did not amount to a pattern of racketeering activity.  Notably, the court observed:

> [a]lthough we hold that no pattern exists in the present case, we want to make clear that the pattern requirement certainly does not bar *all* RICO claims arising in the zoning context. . . . We note that a plaintiff who alleged pervasive involvement by a developer in the political process through widespread racketeering activity could indeed meet the pattern requirement.

*Walsey*, 828 F.2d at 1075.  Thus, the fact that the instant dispute arises in a commercial context does not, in and of itself, take this case outside of the purview of RICO.

1.   **RICO Enterprise**

Defendants argue that Plaintiff has not properly alleged the existence of a RICO enterprise.  Under 18 U.S.C. § 1962(c), it is unlawful:

> for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

"[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).  There must be a "person," alleged to have violated Section 1962(c) and to be liable to the claimant for damages, who is separate and distinct from the "enterprise," or tool, through which the RICO violation occurred.  *See Busby*, 896 F.2d at 840-41.  A "person" can be an individual or corporate entity.  18 U.S.C. § 1961(3).  There may be multiple persons whose association with the same RICO enterprise gives rise to multiple violations of Section 1962(c). "Enterprise," as set forth in 18 U.S.C. § 1961(4), "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated

in fact although not a legal entity." A RICO enterprise is characterized by "'continuity, unity, shared purpose and identifiable structure.'" *United States v. Fiel*, 35 F.3d 997, 1003 (4th Cir. 1994) (citation omitted). An "enterprise" requires proof of three elements: (1) an ongoing organization; (2) associates functioning as a continuing unit; and (3) the enterprise is an entity "separate and apart from the pattern of activity in which it engages." *Proctor v. Metro. Money Store Corp.*, 645 F.Supp.2d 464, 477-78 (D.Md. 2009).

Plaintiff argues that the King Auto Group constitutes an association-in-fact enterprise. (ECF No. 48, at 76). An association-in-fact enterprise is not defined by a formal legal structure, but is instead characterized by the association of its members "for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Unlike Section 1962(a), Section 1962(c) "envisions the enterprise as being different from, not the same as or part of, the person" against whom recovery is sought. *New Beckley Mining Corp. v. Int'l Union, United Mine Workers*, 18 F.3d 1161, 1163 (4th Cir. 1994) (internal citations omitted).[8] "For the purposes of pleading, a corporation may be both a defendant 'person' and

---

[8] The "distinctiveness" requirement is limited to Section 1962(c) claims; Section 1962(a) does not carry this requirement. *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 841 (4th Cir. 1990) ("[F]or a violation of Section 1962(a), the offender and the enterprise need not be separate.  They may be identical.").

part of an association-in-fact enterprise." *Crown Cork & Seal Co. Inc. v. Ascah*, No. 93-2933, 1994 WL 57217, at *4 (E.D.Pa. Feb. 18, 1994). To be organized, an association-in-fact enterprise "need not have a hierarchical structure or a chain of command; decisions may be made on an ad hoc basis and by any number of methods." *Boyle v. United States*, 556 U.S. 938, 948 (2009). On the other hand, "[v]ague allegations of a RICO enterprise . . . lacking any distinct existence and structure" will not survive dismissal. *VanDenBroeck v. CommonPoint Mortg. Co.*, 210 F.3d 696, 700 (6th Cir. 2000), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).

Defendants argue that Plaintiff's RICO allegations fail to differentiate between the "person" and the "enterprise," and thus cannot show distinctiveness under Section 1962(c). Defendants contend that Plaintiff has alleged an enterprise that is "nothing more than the Defendants by a different name ('King Auto Group')." (ECF No. 34, at 20). Defendants essentially argue that because the "King Auto Group" is comprised of the individual dealership Defendants, Plaintiff merely attempts to refer to the "persons" by a different name. As Judge Garbis recently observed, however, in *Bailey v. Atl. Automotive Corp.*, Civ. Action No. MJG-13-1243, 2014 WL 204262, at *17 (D.Md. Jan. 17, 2014), "there is certainly judicial recognition that 'a

defendant may be both a person and a member of a collective RICO enterprise' without negating the distinctiveness requirement." (*citing In re Lupron Mktg. & Sales Practices Litig.*, 295 F.Supp.2d 148, 173 (D.Mass. 2003)); *see also United States v. Urban*, 404 F.3d 754, 782 (3[d] Cir. 2005) (noting that a RICO enterprise "may be comprised only of defendants, or of defendants and non-defendants."). As explained in *Lupron*, "[t]he basic idea is that while one basketball player does not constitute a team, an association of five players does, without each losing his identity as a distinct person." *Id.; cf. Eason v. Merrigan, et al.*, No. Civ.A. DKC 2003-0933, 2004 WL 903756, at *2 (D.Md. Apr. 28, 2004) ("Plaintiff's RICO claim rests entirely on the allegations that Defendant Merrigan carried out his racketeering activity through the enterprise, Defendant Merrigan Enterprises, Inc. As stated, under Fourth Circuit case law, Defendant Merrigan Enterprise, Inc. cannot be both a defendant and the RICO enterprise."). As will be seen, Defendants' argument that each dealership and the "enterprise" are not sufficiently distinct under Section 1964(c) is unavailing.

Defendants' reliance on *Gondel v. PMIG 1020, LLC*, Civ. Action No. CCB-08-1768, 2009 WL 248681 (D.Md. Jan. 22, 2009), and *Myers v. Lee*, No. 1:10cv131 (AJT/JFA), 2010 WL 3745632 (E.D.Va. Sept. 21, 2010) is misplaced. In *Gondel*, 2009 WL

248681, at *4, Judge Blake held that plaintiffs had not pled distinctiveness under Section 1962(c) because, unlike here, "[n]owhere in [the] complaint d[id] plaintiffs [even] mention a distinct enterprise with which the corporate defendants associated in order to carry out their alleged racketeering scheme."   In *Gondel*, plaintiffs did not sufficiently differentiate between the individual defendants named in the complaint and the enterprise, comprised of the individual defendants and its agents.  *See also Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994) ("by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant, the distinctness requirement may not be circumvented.").  Plaintiff in *Myers*, 2010 WL 3745632, at *3, alleged that the "enterprise" was the "Dahn Organization," an association in fact among individuals and corporations "acting in concert to target, control, and defraud its victims of their health, liberty, and property for the financial benefit of the Dahn Organization and its leader, Ilchi Lee."  Importantly, in deciding that plaintiff did not adequately distinguish between the "persons" and the "enterprise," the court noted that "nowhere in the [a]mended [c]omplaint are there any allegations that the affairs of the

enterprise are any different from the affairs of the defendants." *Id.* at *4.

Here, the amended complaint states that each Defendant is a separately incorporated entity, has its own business location and employees, and that through "contractual arrangement and joint management activity, formed an association-in-fact with each other." (ECF No. 22 ¶ 253). Plaintiff avers that "the function of the King Auto Group association-in-fact enterprise is to facilitate a fraudulent scheme of selling prior short-term rental vehicles to consumers without the disclosures required by Maryland law," whereas each dealership Defendant is also engaged in legitimate vehicle sale transactions. (ECF No. 48, at 49). *Myers,* 2010 WL 3745632, at *5, further noted that "[w]hile the Dahn Organization may qualify as an association-in-fact enterprise, [plaintiff] must still prove these defendants participated in the conduct of enterprise's affairs, not just their own affairs." (internal citations omitted). The amended complaint delineates, to some extent, the roles played by different dealership Defendants in the association-in-fact enterprise. For instance, Plaintiff avers that Defendant King Vehicles, Inc. and King Lincoln Inc. advertised prior rentals for the other Defendants on its website – which the other Defendants allegedly sold without the requisite prior short-term rental disclosure – but did not sell the vehicles directly.

Defendant King Hagerstown allegedly furnishes CarFax Reports which contradict the representations made in the sales agreements regarding prior short-term rental use of vehicles, which Plaintiff alleges is part of Defendants' fraudulent scheme to conceal and misrepresent prior rental use of vehicles sold to consumers.

*Bailey*, 2014 WL 204262, also addressed the question of distinctiveness of the "persons" and "enterprise" in the context of Section 1962(c). *Bailey* involved a putative class action lawsuit by consumers against a used car seller, its parent corporation, and the parent's other subsidiaries, alleging that the seller's failure to identify cars as having been prior short-term rentals violated, *inter alia*, RICO. Unlike here, however, the dealer defendants in *Bailey* were wholly owned subsidiaries of Atlantic Automotive Corporation ("Atlantic"), also a named defendant. Plaintiff in *Bailey* alleged that the dealer defendants formed the MileOne Automotive enterprise, consisting of the parent company, Atlantic, and all of its subsidiaries. Under those facts, Judge Garbis reasoned that "just as adequate distinctiveness may be missing between a parent-person and a wholly owned subsidiary-enterprise (or vice versa), *it may also be lacking where the parent and its wholly owned subsidiaries are both the 'alleged persons' and the sole members of the association-in-fact enterprise*." 2014 WL 204262,

22

at *17 (emphasis added).  Judge Garbis found the allegations in the second amended complaint inadequate to plead distinctiveness under Section 1964(c).  He explained:

> Heritage and the Other Dealer Defendants are wholly owned subsidiaries of Atlantic. Plaintiff alleges that Heritage and the Other Dealer Defendants are all used car dealerships under the operation and ownership of Atlantic and that these commonly owned entities operate jointly and associate together as MileOne Automotive to sell used vehicles legitimately, as well as fraudulently.

*Id.* at *18.

Unlike in *Myers* and *Bailey*, Plaintiff has made the requisite showing here.  First, the Defendants are not subsidiaries of a single dealership; according to the amended complaint, each Defendant is an independent car dealership. Moreover, as Plaintiff explains, "[i]n contrast to the lack of distinction between the 'persons' and 'enterprise' in [] *Myers*, the King corporate Defendants joined together to form the King Auto Group association-in-fact *not* just to conduct their own separate affairs as individual car dealerships, but to facilitate a fraudulent scheme involving their co-conspirators." (ECF No. 48, at 53-54).  Plaintiffs allege in the amended complaint that each Defendant owned and operated its own dealership, but also associated together under the non-incorporated "King Auto Group."  (ECF No. 22 ¶ 6).  The amended

23

complaint states that "[a]ll of the Defendants share the moniker 'King' in their corporate names and jointly hold themselves out to the general public under the name King Auto Group." (ECF No. 22 ¶ 6).   Plaintiff further states that "Defendants conduct business using [the King Auto Group] name and have established a central  website,  http://www.KingAuto.com."  (*Id.*  ¶  7). Plaintiff maintains that:

> Through their association, Defendants developed and agreed upon the uniform and systematic scheme described herein to acquire and sell prior short-term rental vehicles to consumers without the disclosures required by Maryland law, with misleading and fraudulent omissions and representations concerning the history of the used vehicles being sold, and with the specific intent to deceive and defraud [] Plaintiff[] and members of the Class.

(*Id.* ¶ 10).   The amended complaint further states that "Defendants were each associated with the enterprise and participated in its management and/or operation by directing its affairs and/or by conducting business with each other and by participating and assisting in the fraudulent scheme described herein to acquire and sell prior short-term rental vehicles without the disclosures required by Maryland law." (*Id.* ¶ 254); *see Mitchell Tracey v. First Am. Title Ins. Co.*, 935 F.Supp.2d 826, 843-44 (D.Md. 2013) ("the association's common purpose was to charge borrowers inflated and illegal fees, to defraud

members of the public and to give effect to the scheme described by a distinct division of labor") (internal citations omitted).

Although "[a]n organization cannot join with its own members to undertake regular corporate activity and thereby become an enterprise distinct from itself," this is not the case here. *Begala v. PNC Bank, Ohio, N.A.*, 214 F.3d 776, 781 (6th Cir. 2000). Here, Plaintiff alleges that the "King Auto Group" is comprised of six different Defendant dealerships and performs functions beyond its ordinary business of selling cars. Defendants' argument that the amended complaint fails to allege that the RICO enterprise has an existence separate and apart from the pattern of racketeering activity in which it was engaged is belied by Plaintiff's assertion that the enterprise also engages in legitimate vehicles sales transactions. (ECF No. 22 ¶ 126). Plaintiff similarly alleges that aside from engaging in a scheme to conceal prior short-term rental use of the vehicles each dealership sold, "the enterprise developed forms and marketing campaigns for *legitimate* vehicle sales transactions." (*Id.* ¶ 126 (emphasis added)); *see Proctor*, 645 F.Supp.2d at 480 (finding that the complaint alleged a pattern of racketeering activity separate from the enterprise where the complaint alleged that the enterprise "did not exist solely for the purpose of engaging in predicate acts violative of RICO, but the enterprises also engaged in legitimate real estate

transactions over the same period of time"). In *Mitchell Tracey*, 935 F.Supp.2d at 844, Judge Quarles found sufficient plaintiffs' allegation that defendant and its title agents "deliberately overcharged and misappropriated amounts due for the purchase of title insurance, in violation of Maryland law. . . . Such unlawful acts are not conducted in the ordinary course of business." Plaintiff similarly alleges that deceiving car buyers is "not a part of any of the Defendants' normal business functions." (ECF No. 48, at 52). Thus, viewing the pleadings in the light most favorable to Plaintiff, she has alleged an enterprise separate and distinct from the "person" and from the racketeering activity.

### 2. Pattern of Racketeering Activity

To show a "pattern of racketeering activity," a plaintiff must "adequately plead at least two predicate acts of racketeering activity[.]" *Am. Chiropractic Assoc. Inc. v. Trigon Healthcare Inc.*, 367 F.3d 212, 233 (4th Cir. 2004) (citing 18 U.S.C. § 1961(5)). Racketeering activity is defined under 18 U.S.C. § 1961(1), as "any act which is indictable" under a number of enumerated criminal provisions, which include violations of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 2314 (interstate transport of money converted or

fraudulently obtained).   Plaintiff cites these three sections as Defendants' predicate acts.[9]

The federal mail and wire fraud statutes prohibit the use of the mails or interstate wires in furtherance of schemes to defraud.   18 U.S.C. §§ 1341, 1343.   To plead mail or wire fraud, a plaintiff must show: (1) a scheme disclosing intent to defraud; and (2) the use, respectively, of the mails or interstate wires in furtherance of the scheme.   *See Chisolm v.*

---

[9] To state a claim for interstate transport of money converted or fraudulently obtained, she must, at a minimum, allege how or when these interstate transports occurred.   *See Kerby v. Mortg. Funding Corp.*, 992 F.Supp. 787, 798 n.3 (D.Md. 1998) (disregarding an alleged predicate act based on nothing more than a "bare allegation" of a violation).   Plaintiff fails to allege facts sufficient to show that Section 2314 is applicable.   Plaintiff's only allegation in the amended complaint pertaining to Section 2314 states that:

> Defendants on hundreds if not thousands of occasions transported, transmitted, and transferred in interstate or foreign commerce money of the value of $5,000 or more, knowing the same to have been obtained and/or taken by fraud, an artifice of fraud, or by means of false or fraudulent pretenses of representations in violation of 18 U.S.C. § 2314.

(ECF No. 22 ¶ 117).   This conclusory allegation is insufficient to plead a predicate act.   *See, e.g., Robinson v. Fountainhead Title Grp. Corp.*, 252 F.R.D. 275, 279 n.4 (D.Md. 2008) (declining to consider predicate act premised on 18 U.S.C. § 2314 where plaintiff merely included a bare assertion that defendants engaged in multiple instances of interstate transports of money converted or fraudulently obtained in violation of 18 U.S.C. § 2314, but did not explain how or when these interstate transports occurred).   Accordingly, Plaintiff fails to plead a predicate act pursuant to Section 2314.

*TranSouth Fin. Corp.*, 95 F.3d 331, 336 (4th Cir. 1996).  In the context of a RICO action, the mailings or wirings do not need to contain the misrepresentations that defrauded the plaintiff, but they must be in furtherance of the fraudulent, material misrepresentation upon which the plaintiff justifiably relied to her detriment.  *Id.* at 337; *see also Day v. DB Capital Grp., LLC*, Civil Action No. DKC 10-1658, at *10 (D.Md. Mar. 11, 2011). Additionally, fraud allegations must state with particularity "the fraudulent acts that form the alleged pattern of racketeering activity" in accordance with Rule 9(b).  *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989) (*quoting Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400-01 (9th Cir. 1986)).

    **a.   Predicate Acts**

Defendants argue that Plaintiff fails sufficiently to plead mail and wire fraud because she cannot show that any Defendant other than King Buick GMC owed a legal duty to Plaintiff and the complaint also fails to identify any predicate acts of criminal wire and mail fraud committed by each of these Other Dealer Defendants.[10]  As to the legal duty argument, Plaintiff need not plead that each Defendant owed her a legal duty in order to plead a *prima facie* civil RICO claim.

---

[10]  Defendants refer to all of the Defendants, except for King Buick GMC, as the "Unrelated Defendants."

Defendants further argue that Plaintiff fails to specify each Defendant's role in the mail and wire fraud. Fed.R.Civ.P 9(b) states that "[i]n alleging fraud . . . a party must state with particularity the circumstances constituting fraud." Thus, when mail and wire fraud are asserted as predicate acts in a civil RICO claim, each must be pled with particularity required by Rule 9(b). *See WW, LLC v. Coffee Beanery, Ltd.*, Civ. Action No. WMN-05-3360, 2012 WL 3728184, at *10 (D.Md. Aug. 27, 2012). Defendants state that Plaintiff's "repeated reference, in bare and conclusory fashion, to the 'defendants' generally refers to all of the different Defendants, without identifying which Defendant allegedly committed any act of mail or wire fraud, or made any fraudulent[] misrepresentation, or to whom." (ECF No. 34-1, at 26). Defendants assert that such generalized allegations do not meet the heightened pleading standard of Rule 9(b) required for civil RICO claims premised on fraud. Defendants in *Superior Bank, F.S.B. v. Tandem Nat. Mortg., Inc.*, 197 F.Supp.2d 298 (D.Md. 2000), posited the same argument, which was rejected. Defendants in *Superior* argued that plaintiff failed to allege a "pattern of racketeering activity" against them because the amended complaint did not allege that *each* defendant committed separate specific acts of mail or wire fraud. Judge Garbis concluded that "[t]his argument is completely without merit, as section 1962(c) includes no

requirement that mail or wire be used by each defendant." 197 F.Supp.2d at 323; *see also Kerby v. Mortg. Funding Corp.*, 992 F.Supp. 787, 801 (D.Md. 1998) ("just as the plaintiffs do not have to rely on the mail and wire communications themselves, but only on the misrepresentation that is furthered by those communications,[], the mails and wires do not have to be used by each defendant, but merely in furtherance of the scheme."). More recently, Judge Quarles rejected this argument in *Mitchell Tracey*, 935 F.Supp.2d at 845, involving a class action lawsuit brought by homeowners against a title insurer alleging that the insurer and its agents overcharged homeowners for title insurance connected with refinancing. Defendant in *Mitchell Tracey*, 935 F.Supp.2d at 845, argued that plaintiffs failed sufficiently to plead mail and wire fraud because they did not identify the circumstances surrounding any false representations, including the time, place, content, and speaker. Judge Quarles rejected this argument:

> "A scheme to defraud means any deliberate plan of action or course of conduct by which someone intends to deceive or cheat another or by which someone intends to deprive another of something of value." *Levine v. First Am. Title Ins. Co.*, 682 F.Supp.2d 442, 462 (E.D.Pa. 2010). Here, the [p]laintiffs allege that First American's title agents made the initial contact with the consumer, and each time, they "falsely and intentionally misrepresented to their customers that they would pay only the filed or best rate for title insurance. . . . The

> [p]laintiffs further allege that First
> American and its title agents acted with the
> intent to defraud: specifically, to
> overcharge borrowers for title insurance,
> "guarantee[ing] a stream of business" for
> First American.

935 F.Supp.2d at 845. Based on these allegations, Judge Quarles concluded that plaintiffs in *Mitchell Tracey* had shown a scheme to defraud.

Much like in *Mitchell Tracey*, at this juncture, Plaintiff's allegations are sufficient to survive a motion to dismiss. Plaintiff alleges that "Defendants failed to disclose and intentionally concealed from Named Plaintiffs and the Class the material fact that vehicles sold to them previously were used as short-term rentals." (ECF No. 22 ¶ 4). Plaintiff asserts that "Defendants all used the identical form vehicle sales agreements[, which] included a space specifically designated for the disclosure of the prior non-consumer use of the vehicles being sold." (*Id.* ¶ 54). Plaintiff asserts that despite this disclosure built into the form, "each Defendant routinely failed to use this space to identify the prior short-term rental use of the vehicles it sold to retail buyers and knew the other King Auto Group Defendants failed to do so as well." (*Id.* ¶ 55). In addition to the sale transaction on February 18, 2012, when King Buick GMC allegedly failed to disclose to Ms. Chambers that the vehicle she purchased was a prior short-term rental, the amended

31

complaint identifies fifteen (15) additional transactions over a two-year period, in which King Volkswagen, King Hagerstown Motors, and King Auto of Silver Spring allegedly "failed to disclose clearly and conspicuously the prior short-term rental use of used vehicles sold" to consumers. (*Id.* at 12-14); *see DB Capital Grp.*, 2011 WL 887554, at *12 (finding sufficient allegations regarding other victims of defendants' scheme and that the enterprise operated for at least two years and targeted dozens of properties, even where two predicate acts toward plaintiff were not alleged). Specifically, Plaintiff includes a chart in the amended complaint identifying the approximate vehicle sale date, a description of the vehicle (*e.g.,* 2008 Volkswagen Jetta S, 2008 Mazda6I), and the vehicle identification number ("VIN"). The amended complaint states that King Lincoln and King Vehicles did not sell prior short-term rental vehicles "in their own names but, rather, routinely sold these vehicles through their King Auto group co-conspirators – King Buick, King Volkswagen, LLC, King Hagerstown Motors, LLC or King Auto of Silver Spring, LLC." (*Id.* ¶ 44). Plaintiff asserts that King Lincoln and King Vehicles marketed prior rentals to consumers and "other King Auto Group Defendants consummated these sales on behalf of these two Defendants as part of and in furtherance of Defendants' conspiracy, agreements, and aiding and abetting one another's illegal acts."

(*Id.*).   For purposes of a motion to dismiss, Plaintiff alleges with sufficient specificity the Defendants' involvement in the alleged scheme to defraud consumers into purchasing vehicles previously used as short-term rentals by concealing or misrepresenting the fact that these vehicles were prior short-term rentals from the Buyer's Order.

Defendants also argue that the amended complaint "fails to identify any fraudulent mail or wire sent allegedly by the Unrelated Defendants to Plaintiffs or anyone else in connection with the purchase of their vehicles."   (ECF No. 34-1, at 28).   Defendants argue that "the Complaint fails to identify how the Unrelated Defendants allegedly used generic mail or wire to further the alleged fraudulent scheme against the Plaintiff[] (who they did not know and had no involvement) so as to constitute criminal mail and wire fraud under RICO."   (ECF No. 34-1, at 28).   They argue that "[e]very commercial transaction will inevitably require using the mail or wire system as part of its ordinary business, but this does not establish criminal mail fraud or the requisite pattern of racketeering activity." (*Id.*).   As explained above, however, "[t]o be part of the execution of the fraud . . . the use of the mails need not be an essential element of the scheme." *Schmuck v. United States*, 489 U.S. 705, 710 (1989).   Instead, they need only be "incident to an essential part of the scheme." *Pereira v. United States*, 347

U.S. 1, 8 (1954); *see also In re Am. Honda Motor Co. Dealerships Litig.*, 941 F.Supp. 528, 546 n.19 (D.Md. 1996) (stating that "a mailing need only be a necessary step in furtherance of a scheme, and need not be fraudulent in and of itself."). Moreover, despite the high standard demanded by the Rule 9(b) particularity requirement, in the context of RICO mail fraud, the court may also consider the interplay of the more liberal notice pleading standard of Rule 8, which simply requires "a short and plain statement." *Kerby v. Mortg. Funding Corp.*, 992 F.Supp. 787, 799 (D.Md. 1998); *Coffee Beanery*, 2012 WL 3728184, at *10. Courts have acknowledged the difficulty that arises in pleading a RICO suit against multiple defendants – such as the case here – and have determined that it is "not necessary that a plaintiff elucidate every single detail of the alleged fraud." *Coffee Beanery*, 2012 WL 3728184, at *10; *Mylan Labs., Inc. v. Azko, N.V.*, 770 F.Supp. 1053, 1074-75 (D.Md. 1991). These courts have determined that, when balancing these rules,

> [t]he most basic consideration in making a judgment as to sufficiency of a pleading is the determination of how much detail is necessary to give adequate notice to an adverse party and enable him to prepare a responsive pleading.

*Kerby*, 992 F.Supp. at 800.

Plaintiff has alleged the predicate acts of mail and wire fraud with sufficient particularity at this juncture. Plaintiff

asserts that the mailings in furtherance of the fraudulent
scheme included: the mailing and distribution among Defendants
of contracts, form sale and credit agreements, and other
documents used in the transactions of Plaintiff and members of
the putative class.  (ECF No. 22 ¶ 102).  Plaintiff further
contends that:

> Defendants and their co-conspirators on
> hundreds if not thousands of occasions used,
> and caused to be used, telephone, Internet
> and other wire transmissions including, but
> not limited to, use of the wires in the sale
> of vehicles previously used as prior short-
> term rental vehicles to Named Plaintiff[]
> and members of the Class; in the emailing,
> faxing and transmission by wire of documents
> such as loan applications, vehicles sale and
> financing contracts and other documents
> related to the sale and financing of
> vehicles by Defendants to potential
> assignees in the transactions of Named
> Plaintiff[] and Class members who financed
> their vehicles with Defendants; in the
> electronic registration and titling system
> established with the MVA; and in the
> marketing of their enterprise "King Auto
> Group" and its vehicles on the Internet –
> with the intent to defraud and in
> furtherance of their scheme to defraud.

(*Id.* ¶ 103).

In *Coffee Beanery*, 2012 WL 3728184, at *11, Judge Nickerson
found persuasive that "[p]laintiffs have outlined the alleged
scheme to defraud, a time frame for the scheme, who was targeted
by the scheme, the contents of the allegedly fraudulent
communications that were sent using the mails and wires, and

what [d]efendants hoped to obtain through the scheme." Judge Nickerson held that "[c]oupling these specific allegations with the broader allegations that the [d]efendants used the mails as part of the scheme to defraud other unnamed potential franchisees is sufficient to meet the requirements of Rule 9(b)." Here too, Plaintiff has outlined the alleged scheme to defraud consumers by failing to disclose the prior short-term rental use of vehicles sold by the Defendants, a time frame for the alleged scheme, and the role of mail and wires in the scheme. *See, e.g., Mitchell Tracey*, 935 F.Supp.2d at 845 (finding sufficient allegations of mail and wire fraud where the complaint alleged "specific dates when [defendant] used the mail and electronic communication to further its scheme" and stated that distributions of the profits were sent interstate).

Plaintiff further asserts that "on or before February 18, 2012, Defendants used the wires to advertise the vehicle sold to Ms. Chambers on the Internet, "without the required clear and conspicuous disclosure of this vehicle's prior use as a short-term rental required by Maryland law." (*Id.* ¶ 106). Plaintiff avers that in February 2012, "Defendants used the wires and/or U.S. mail to submit a loan application, contract of sale, and other documents related to the sale to a potential assignee for the financing of Ms. [Chambers's] prior but undisclosed short term rental vehicle – namely Capital One Auto Finance." (*Id.* ¶

36

112).  Following the sale to Ms. Chambers, Defendants allegedly used the mails to "submit the original documents relating to the financing and sale of Ms. Chamber[s's] vehicle to its assignee, Capital One." (*Id.*).

Plaintiff contends that Defendants used the wires to "register and title Ms. Chamber[s's] vehicle through an electronic registration and titling system."  (*Id.* ¶ 113). Specifically, Defendants allegedly used the wires electronically to transfer $587.95 of funds to the MVA in connection with Ms. Chambers's transaction on February 18, 2012, for payment of sales tax, titling and registration fees.  Defendants also allegedly used mails and wires to advertise and sell to putative class members the vehicles previously used as short-term rentals without the requisite disclosure in the fifteen additional transactions Plaintiff has identified in the complaint, including the date of the transaction. (*Id.* ¶¶ 108, 114; *see also* ¶ 104 ("Defendants used the Internet and the wires in connection with the sale of hundreds if not thousands, of vehicles sold to members of the class by providing a forum in which customers could search for and receive information regarding vehicles offered for sale by Defendants, including the prior rental vehicles sold by Defendants.")).  Plaintiff also avers that:

> Defendants further used the wires to send and receive purchase orders, retail installment contracts, and other documents among their co-conspirators, funding lenders, and other entities; to distribute money among those entities; to transmit to the MVA information related to the registration and titling of motor vehicles purchased and sold by Defendants to Named Plaintiff[] and members of the Class; to transmit among the Defendants forms and other documents used in the sale of vehicles.

(*Id.* ¶ 109). Finally, according to Plaintiff, "Defendants further used the wires to facilitate the operation of and to operate the fraudulent scheme described herein, and to communicate with each [other] during the course of the scheme through telephone calls, facsimiles, e-mail transmissions, and wire transfers of money resulting from and in furtherance of the fraudulent scheme." (*Id.* ¶ 116); *see, e.g., Proctor*, 645 F.Supp.2d at 474 ("[p]laintiffs have pleaded the predicate acts of mail and wire fraud with particularity against the background of a grand mortgage foreclosure rescue scam that involved the sale and leaseback of [p]laintiffs' properties from which [two settlement agents] among others would siphon off and transfer the equity illegally.").

In *Coffee Beanery*, 2012 WL 3728184, Judge Nickerson found sufficient the allegations supporting mail and wire fraud because plaintiffs specifically alleged the circumstances surrounding the use of the mails with regard to fraudulent

statements and listed the material facts they believed were fraudulently omitted. *Coffee Beanery*, 2012 WL 3728184, at *11. Judge Nickerson observed: [look to see if repetitive with prior]

> Plaintiffs further provide the names of seven other individuals who received through the mails or wires copies of allegedly fraudulently UFOCs dated from 2002 and 2003.[] Plaintiffs then allege with particularity the fraudulent misrepresentations and omissions contained in Coffee Beanery's UFOCs issued annually from September 2003 to October 2011.[] Making all inferences in favor of Plaintiffs, the Court can construe these allegations to suggest that every potential franchisee from 2002 until at least 2011 was provided with a fraudulent UFOC, and that the majority of the fraudulent UFOCs were transmitted through the mail or wires.

*Id.* Although the facts are less compelling here, Plaintiff identifies fifteen additional transactions between 2010 and 2011, in which consumers entered into sales agreements for vehicles as a result of Defendants' fraudulent scheme to sell prior short-term rental vehicles without the requisite disclosures. For these fifteen transactions, Plaintiff identifies the approximate vehicle sale date, the vehicle description, VIN, and the Defendant dealership that consummated the transaction. (*See* ECF No. 48, at 41). Plaintiff asserts that mail and wire were used to send the loan documents and financing contracts in connection with the fraudulent transactions, to register and title the sold vehicles, and to

39

wire funds to the MVA in connection with the vehicle sale transactions.   (ECF No. 22 ¶¶ 111-114).   These acts involving mail and wire use were allegedly made in connection with consummating the fraudulent sale of the vehicles to induce unaware consumers into purchasing prior short-term rentals.   *See* *VNA Plus, Inc. v. Apria Healthcare Grp., Inc.*, 29 F.Supp.2d 1253, 1263 (D.Kan. 1998) (noting that the requirements to plead specific instances of mail or wire fraud is "relaxed where there are 'numerous mailings of standardized documents containing identical false representations.'").   Plaintiff points out that "[a]bsent their use of the mails and/or wires in connection with the financing, registration and titling of the prior short-term rentals they sold pursuant [to] their fraudulent scheme, Defendants would not have been able to consummate this scheme." (ECF No. 48, at 62 n.46).

Defendants also challenge Plaintiff's RICO allegations insofar as they fail to demonstrate that the conduct of the enterprise affected interstate commerce.   Defendants assert that "the gravamen of Plaintiffs' claim is that the 'enterprise' consists of Maryland-automobile dealers, licensed by the Maryland MVA to sell cars in Maryland to two Maryland residents in a manner that does not comply with the Maryland law applicable to automobiles sales occurring solely in Maryland." (ECF No. 34-1, at 44).   Defendants are correct that Plaintiff

40

must plead the existence of a RICO enterprise whose activities affected interstate commerce. *See DB Capital Group*, 2011 WL 887554, at *13. The allegations in the amended complaint concerning interstate commerce are sufficient at this stage of the proceedings. As Plaintiff summarizes in the opposition, she "alleges the King Auto Group purchased previously used rental vehicles *out-of-state* for sale in Maryland, wired and mailed monies from Maryland to lenders outside of *Maryland* in connection with financing of such vehicles, and uses the wires and mails to forward loan applications, contracts and other documents from Maryland to persons *outside of Maryland* in connection with the sales of such vehicles." (ECF No. 48, at 78 n. 67) (emphasis in original). Specifically, Plaintiff alleges that "Defendants and King Auto Group were engaged in, and affected interstate commerce in that, *inter alia*, the vehicle sales that are the subject of the scheme to defraud were consummated in Maryland using vehicles that in many circumstances were purchased out-of-state for sale in Maryland." (ECF No. 22 ¶ 101). Plaintiff asserts that "Defendants wired funds or mailed checks from Maryland to persons outside of Maryland to pay for prior short-term rentals later sold within Maryland." (*Id.*). Plaintiff further avers that in February 2012, King Buick GMC used mails and/or wires to submit a loan application, contract of sale, and other documents related "to

the sale to a potential assignee for the financing of Ms. Chamber[s's] prior but undisclosed prior short-term rental vehicle" to Capital One Auto Finance, headquartered in Virginia. (*Id.* ¶ 112). Plaintiff asserts a similar pattern for the additional fifteen allegedly fraudulent vehicle sale transactions. Finally, Plaintiff avers that "Defendants divvied up their profits secured from selling prior short-term rental vehicles sold in violations of the disclosure requirements under Maryland law, and those profits – constituting far more than $5,000 – were distributed through interstate commerce." (*Id.* ¶ 118); *see Mitchell Tracey*, 935 F.Supp.2d at 845 (finding sufficient allegations that "[d]istributions of the profits were sent interstate."). Drawing all inferences in favor of Plaintiff, the allegations in the amended complaint regarding the predicate offenses and interstate commerce survive dismissal.

   **b.   Pattern of Racketeering Activity**

   To state a plausible claim of a pattern of racketeering activity, the plaintiff must allege facts establishing "that the racketeering predicates are related and that they amount to or pose a threat of continued criminal activity." *Cf. H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (reversing a 12(b)(6) dismissal of a RICO complaint and discussing what a plaintiff in a RICO case must show to prove a pattern of

racketeering activity). With respect to the requirement that the predicate acts be "related," the Fourth Circuit has explained that "[t]he relationship criterion may be satisfied by showing that the criminal acts 'have the same or similar purposes, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events.'" *Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians*, 155 F.3d 500, 505-06 (4th Cir. 1998) (*quoting H.J. Inc.*, 492 U.S. at 240). Plaintiff alleges that Defendants' acts were "related, as they had the similar purpose of concealing and affirmatively misrepresenting the prior rental history of vehicles sold to Defendants' customers, and they used the same methods of commission by concealment and affirmative misrepresentation." (ECF No. 22 ¶ 124). Plaintiff identifies fifteen other vehicle sale transactions. In *Coffee Beanery*, 2012 WL 3728184, at *12, Judge Nickerson found sufficient to satisfy the relationship requirement the following allegations:

> Plaintiffs allege that all of the representations were made for the express purpose of inducing [p]laintiffs, and other potential franchisees, to investee in Coffee Beanery café franchises, and that the scheme involved providing the same fraudulent UFOCs and making the same false representations to franchisees in support of this end. Essentially, as alleged, the predicate acts of mail and wire fraud were perpetrated an uncounted number of times against the same type of victim in a nearly identical manner. In the context of a motion to dismiss, the

> Court finds these allegations sufficient to
> satisfy the relationship requirement.

Plaintiff here also alleges that the predicate acts of mail and wire fraud were perpetrated on at least fifteen other occasions with separate consumers in an effort to induce them to purchase vehicles that dealership Defendants did not disclose were previously used as prior short-term rentals. Accordingly, the relatedness element is satisfied.

Defendants also argue that Plaintiff's allegations are insufficient to meet the continuity-of-activity requirement. A plaintiff can fulfill the continuity-of-activity requirement by establishing either a closed or open-ended pattern. *H.J. Inc.*, 492 U.S. at 241. A "closed-ended" pattern of racketeering activity involves a course of related predicate acts during a substantial period of time which naturally comes to a close, while an open-ended pattern involved conduct "that by its nature projects into the future with a threat of repetition." *Coffee Beanery*, 2012 WL 3728184, at *12 (*citing Whitney, Bradley & Brown, Inc. v. Kammermann*, 436 F.App'x 257, 259 (4th Cir. 2011)).

Plaintiff's amended complaint suggests that she attempts to establish an open-ended pattern. Specifically, Plaintiff asserts that King Auto Group is an association-in-fact that "has continued as a unit, with a core membership, over a substantial period of time, exceeding five years, and is an ongoing

organization established for an economic motive." (ECF No. 22 ¶ 231). Defendants assert that the amended complaint fails to plead facts demonstrating a threat of continuing future criminal conduct for essentially two reasons. First, Defendants argue that there is no criminal activity at all because the prior short-term rental disclosure was made in the CarFax Report, which Defendants maintain Plaintiff received along with the Buyer's Order and which indicated that the vehicle she bought was previously used as a short-term rental. (ECF No. 34-1, at 38). This argument is unpersuasive at this point because whether Plaintiff received the CarFax Report before she consummated the transaction is a disputed fact, and inappropriate to resolve on a motion to dismiss. (*See* ECF No. 48-2, at 33, Declaration of Latechia Chambers ("I do not recall anyone at the dealership showing me a Carfax report or asking me to sign or initial it, though I do recall signing quite a few documents wherever the King rep put an "x" mark next to a line for my signature, but the Carfax report was NOT one of those documents" (emphasis in original)).

Second, Defendants argue that there is no threat of continuing future criminal conduct or that the pattern of racketeering activity is open and ongoing because on May 14, 2013, the State of Maryland promulgated its own disclosure form to be used by motor vehicle dealers - Disclosure of Former

Vehicle Use Form, VR-460.   (*See* ECF No. 34-7).   Defendants argue that:

> [i]n so doing, the MVA conclusively put an
> end to Plaintiff['s] erroneous theory that
> disclosure of a vehicle's prior rental
> history on a 'separate document[,]' signed
> by the customer, somehow violates COMAR, or
> that Maryland law requires that the prior
> use disclosure must be on the Buyer's Order,
> or sales agreement, or in bold, or in super
> large print as alleged in their Complaint.

(ECF No. 34-1, at 40).   As Plaintiff points out, though, her RICO claims are based on Defendants' alleged scheme to defraud, not just an alleged violation of COMAR or an MVA bulletin. Furthermore, Defendants' argument assumes that the dealership Defendants accused of fraudulent misrepresentations and concealment will cease this alleged conduct and use this new form.   Defendants further argue that the conduct attributed to the RICO enterprise lasted less than eighteen months, which is insufficient to establish continuity for RICO pattern purposes. Although Defendants are correct to note that the Fourth Circuit has expressed reservations about RICO claims where the predicate acts are mail and wire fraud, *see GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 549 (4th Cir. 2001), as Judge Blake explained in *Friedler, M.D., et al. v. Cole, Jr., et al.*, No. Civ.A. CCB-04-1983, 2005 WL 465089, at *9 (D.Md. Feb. 28, 2005), "determining whether a pattern exists is a commonsensical, fact-specific inquiry, not a mechanical one

determined solely by the number of predicate acts over a given time period." (internal citations omitted). Rather, the critical inquiry is whether the predicate acts demonstrate the kind of relatedness and continuity that distinguish widespread fraud threatening long-term criminal activity from ordinary fraud not properly subject to RICO's penalties. *The Maryland-National Capital Park and Planning Comm'n v. Boyle*, 203 F.Supp.2d 468, 476 (D.Md. 2002) (explaining that the Fourth Circuit emphasizes that "the heightened civil penalties of RICO 'are reserved for schemes whose scope and persistence set them above the routine'" (*quoting HMK Corp. v. Walsey*, 828 F.2d 1071, 1074 (4th Cir. 1987))).

The Fourth Circuit has identified several factors to consider when determining whether a RICO pattern exists. These factors, including, "the number and variety of predicate acts and the length of time over which they were committed, the number of putative victims, the presence of separate schemes, and the potential for multiple distinct injuries," should be considered along with "all the facts and circumstances of the particular case – with special attention to the context in which the predicate acts occurred." *Brandenburg v. Seidel*, 859 F.2d 1179, 1185 (4th Cir. 1988), *overruled on other grounds by Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996). The facts as pled in the amended complaint are readily

distinguishable from cases where courts have found the alleged pattern of racketeering activity - consisting only of acts of mail and wire fraud – insufficient to present the sort of "ongoing unlawful activities whose scope and persistence pose a special threat to social well-being." For instance, in *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989), the court found that plaintiffs' allegations failed to satisfy the continuity prong of RICO's pattern requirement. The court noted:

> Defendants' actions were narrowly directed towards a single fraudulent goal. They involved a limited purpose: to defraud Menasco, Inc. and Lucky Two, Inc. with respect to their oil interests. They involved but one perpetrator: Wasserman. *They involved but one set of victims: Menasco and Lucky Two.* Finally, the transaction took place over approximately one year. Clearly, these acts do not constitute 'ongoing lawful activities whose scope and persistence pose a special threat to social well-being.' [*International Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 155 (4th Cir. 1987).]

(emphasis added). Here, unlike in *Menasco*, Plaintiff does not allege that the fraudulent scheme was only directed at her. Instead, Plaintiff alleges that King Auto Group enterprise undertook a scheme to defraud consumers into purchasing vehicles that were previously used as short-term rentals, but which disclosure was not made clearly and conspicuously as required under Maryland law.

In *Bailey*, 2014 WL 204262, at *19, Judge Garbis held that there was no viable claim of a pattern of racketeering activity because Plaintiff "alleged only one instance of specific fraudulent conduct directed at her."[11]   Judge Garbis further found insufficient "the conclusory general assertion that the [d]efendants engaged in numerous acts of mail and/or wire fraud by concealing the former short-term rental use of vehicles from purchasers other than Bailey." *Id.*   Unlike in *Bailey*, Plaintiff specifies fifteen transactions – in addition to Ms. Chambers's transaction – in which members of the enterprise are alleged to have engaged in predicate acts that injured consumers.   As stated, Plaintiff includes in the amended complaint the approximate vehicle sale date, a vehicle description, and VIN. (*See* ECF No. 22 ¶ 43).   The amended complaint alleges that Defendants carried out their scheme to defraud in numerous repeated consumer transactions between 2010 and 2012. (*See* ECF No. 48, at 58); *HMK Corp. v. Walsey*, 828 F.2d 1071, 1075 (4th Cir. 1987) ("In a private, commercial context, the fact that a scheme spans many years might constitute powerful support for the finding of a pattern of racketeering activity."); *Orteck Intern. Inc. v. TransPacific Tire & Wheel, Inc.*, Civ. Action No.

---

[11]   Judge Garbis stated, however, that plaintiff can reinstate the RICO claim in the event that discovery as to the viable claims yields evidence adequate to support a plausible claim of a pattern of racketeering activity.

DKC 2005-2882, 2006 WL 2572474, at *18 (D.Md. Sept. 5, 2006) (noting that "similar fraudulent schemes employed against multiple victims by the same defendant may be found to satisfy the related and continuous elements and therefore show a *pattern* of racketeering activity"); cf. *Grant v. Shapiro & Burson, LLC*, 871 F.Supp.2d 462, 475 (D.Md. 2012) (dismissing RICO claim because the complaint failed to allege any specific fraudulent conduct outside of that directed to the plaintiff); *Davis v. Wilmington Fin., Inc.*, No. PJM 09-1505, 2010 WL 1375363, at *4 (D.Md. Mar. 26, 2010) (dismissing RICO claim because, *inter alia*, the allegations of racketeering in the complaint were "limited solely to Plaintiffs and their mortgage transaction"). Defendants argue that Plaintiff's claims "boil[]down to a contract dispute between a licensed automobile dealership (King Buick GMC) and [] customers who do not believe the disclosure they signed was sufficient enough," (ECF No. 34-1, at 39), but Plaintiff asserts in the amended complaint that she did not receive *any* disclosure regarding her vehicle being used as a prior short-term rental. Moreover, as discussed *supra*, whether Plaintiff signed any disclosure is a disputed fact inappropriate to consider on a motion to dismiss.

In *Friedler*, 2005 WL 465089, at *12, Judge Blake determined that the predicate acts, consisting mainly of mail and wire fraud, failed to establish a RICO pattern. Unlike here, the

50

complaint in *Friedler* described a fraudulent scheme spearheaded by a single defendant and "narrowly targeted to misappropriate the plaintiffs' investments." Judge Blake noted that "[i]f plaintiffs had alleged a more widespread scheme, involving various predicate acts and other offenders and victims, then the fraud they suffered would more closely resemble the kind that "rises above the routine" and "poses a threat to social well-being." *Id.* Here, Plaintiff has alleged a widespread fraud scheme involving various victims, which – at this stage – suggests a continuing pattern of racketeering activity. *See, e.g., Superior Bank*, 197 F.Supp. at 324 (finding the RICO pattern requirement satisfied where over thirty defendants coordinated a mortgage flipping scheme involving twenty-three transactions); *Thomas v. Ross & Hardies*, 9 F.Supp.2d 547, 555 (D.Md. 1998) (finding a RICO pattern existed where defendants directed a broad, open-ended scheme to recruit and defraud homeowners through a mortgage scheme). Ultimately, Plaintiff will need significantly more proof to establish RICO violations, but viewing the pleadings in the light most favorable to her, she has pled adequate facts for the Section 1962(c) claims to proceed based on a pattern of racketeering activity.

### 3. Proximate Cause

The parties also disagree over the means by which Plaintiff may satisfy RICO's proximate cause requirement in a class

action.   To state a claim under civil RICO, a plaintiff is required to show that a RICO predicate offense "not only was a 'but for' cause of his injury, but was the proximate cause as well." *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 268 (1992).   Proximate cause for RICO purposes should be evaluated in light of its common-law foundations; proximate cause thus requires "some direct relation between the injury asserted and the injurious conduct alleged." *Id.*   A link that is "too remote," "purely contingent," or "indirec[t]" is insufficient. *Id.* at 271.   As the United States Supreme Court made clear in *Hemi*, 559 U.S. at 12, "in the RICO context, the focus is on the directness of the relationship between the conduct and the harm." *See also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.").

The fraudulent conduct alleged here is the misrepresentation and concealment of the rental history of the vehicles sold to Plaintiff and other consumers in violation of Maryland law.   Plaintiff's alleged injury was that she was overcharged for the vehicle because the vehicle was sold falsely as a former consumer car.   (ECF No. 22 ¶ 249); *Bailey*, 2014 WL 204262, at *15 (holding that plaintiff has alleged a cognizable

RICO injury where plaintiff alleged that "she suffered the claimed loss at the moment of purchase in reliance upon the false representation that she was not buying a former short-term rental vehicle."). Plaintiff asserts that:

> [a]s a direct and proximate result of Defendants' negligent statements, representations, and omissions of material fact . . . Plaintiff[] and Class members were induced, *ab initio*, to enter into sales agreements for vehicles with Defendants, paid significantly more for their vehicles than these vehicles were worth, and otherwise were harmed.

(ECF No. 22 ¶ 209). Unlike in *Hemi*, where the Supreme Court found that "[m]ultiple steps [] separate the alleged fraud from the asserted injury," there is a sufficiently direct relationship between the wrongful conduct here and the alleged injury. *Hemi*, 559 U.S. 1, involved a lawsuit by the City of New York against out-of-state cigarette retailers and affiliated individuals. The United States Supreme Court held - on readily distinguishable facts - that the city failed to establish the proximate cause element of a civil RICO claim. According to the City, Hemi committed fraud by selling cigarettes to city residents and failing to submit the required customer information to the State. Without the reports from Hemi, the State could not pass on the information to the City. Some of the customers legally obligated to pay the cigarette tax to the City failed to do so. Because the City did not receive the

customer information, the City could not determine which customers had failed to pay the tax. Thus, plaintiff argued that the City was injured in the amount of the portion of back taxes that were never collected. On these facts, the Supreme Court concluded that the City's theory of causation was far too indirect. The Court noted that:

> the conduct directly responsible for the City's harm was the customers' failure to pay their taxes. And the conduct constituting the alleged fraud was Hemi's failure to file Jenkins Act reports. Thus, [], *the conduct directly causing the harm was distinct from the conduct giving rise to the fraud.*

559 U.S. at 11 (emphasis added). Unlike in *Hemi*, the conduct giving rise to the harm here (failure to disclose prior short-term rental use) is the same conduct that gave rise to the fraud.

Defendants assert that Plaintiff fails to allege that she detrimentally relied on any fraudulent mail or wire sent by the *Unrelated Defendants*, "or the specific harm directly caused to them as a result of the predicate acts allegedly committed by each Unrelated Defendant." (*Id.* at 32). Defendants essentially argue that because Plaintiff only dealt with King Buick GMC, she cannot show reliance in connection with the Other Dealer Defendants with which she did not transact business. As Judge Nickerson stated in *Robinson v. Fountainhead Title Grp. Corp.*,

Civ. No. WMN-03-3105, 2009 WL 539882, at *2 (D.Md. Mar. 3, 2009), "a RICO claim predicated on mail fraud is based on the fraudulent scheme rather than on a particular fraudulent mailing." *See also Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 648 (2008) ("[u]sing the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud, and hence a predicate act of racketeering under RICO, even if no one relied on any misrepresentation."). Plaintiff alleges that the Other Dealer Defendants are participants in the fraudulent scheme to defraud her and other consumers. Thus, Plaintiff need not have relied on any specific fraudulent mailing or wire by the Other Dealer Defendants in order to assert a civil RICO claim in a putative class action predicated on mail and wire fraud. Defendants maintain that "[t]here is no direct relationship between the Plaintiff['s] alleged injury and any alleged fraudulent mail or wire sent by the *Unrelated Defendants*," thus Plaintiff cannot show reliance. (*Id.*) (emphasis added). But "[p]laintiff need only show reliance on the scheme, not necessarily on any particular fraudulent mailing or misrepresentation." *Robinson v. Fountainhead Title Grp. Corp.*, 257 F.R.D. 92, 95 (D.Md. 2009). Here, the injury as alleged by Plaintiff, was caused by the fraudulent scheme – that all of the Defendants allegedly facilitated - of concealing prior short-term rental use of the vehicles they were selling.

Judge Messitte's reasoning in *Biggs v. Eaglewood Mortg. LLC*, 636 F.Supp.2d 477, 479 (D.Md. 2009), applies here:

> *Bridge* did not eliminate reliance as an element of a RICO claim predicated on mail fraud. The Supreme Court was presented with a situation where the plaintiffs themselves had not received or relied upon misrepresentations made by defendants, but had relied on misrepresentations defendants made to others. *See Bridge*, 128 S.Ct. at 2139. *What the Court held was that, even though plaintiffs had not themselves relied on the misrepresentations made by defendants, they properly asserted a claim because first-party reliance is not a required element of a RICO claim predicated on mail fraud. See Id.* at 2145. The Court was careful to note, however, that "none of this is to say that a RICO plaintiff who alleges injury by reason of a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations." *Id.* at 2144 (internal quotations omitted).

(emphasis added). Here, Plaintiff has alleged that she justifiably relied on the misrepresentation made in the Buyer's Order, which encompassed the alleged scheme involving "Defendants' concealments, failures to disclose and affirmative misrepresentations concerning the prior rental use of the used vehicles they purchased when they consummated their transactions." (ECF No. 22 ¶ 176); *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 840 (4th Cir. 1990) ("We think the plaintiff has alleged causation. Whether he will be able to prove it at trial is not a question on which we express any view. Rather, we are

deciding whether this aspect of the complaint survives a Rule 12(b)(6) motion, and we confine ourselves to the allegations of the complaint").

Defendants' argument that Plaintiff's alleged injuries were caused by her own conduct is also unpersuasive. Defendants argue that "Plaintiff['s] alleged injury occurred either because [she] ignored or failed to read the CarFax Report [she] signed which clearly discloses five times that it was a prior rental vehicle." (ECF No. 34-1, at 34). Thus, the argument goes:

> Plaintiff[] here cannot logically or legally contend that the absence of the "x" on the line on the Buyer's Order fraudulently induced [her] to buy the vehicle, but that the presence of this fact disclosed five times in the Carfax Report [she] received and signed at the same time, acknowledging that [she] knew the very fact [she] claim[s] was omitted, does not negate this inducement.

(*Id.* at 35). As explained *supra*, the Carfax Report was not attached to the complaint, but to Defendants' motion to dismiss the federal claims. Although as a general rule extrinsic evidence should not be considered at the 12(b)(6) stage, the Fourth Circuit has held that when a defendant attaches a document to its motion to dismiss, "a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint *and [if] the plaintiffs do not challenge its authenticity*." *Phillips v.*

*LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999) (emphasis added).  Here, Plaintiff challenges the authenticity of the CarFax Report and disputes ever having received or signed the version Defendants provide.  She states in an affidavit that she "do[es] not recall anyone at the dealership showing [her] a Carfax report or asking [her] to sign or initial it." (ECF No. 48-2, at 33).  She further avers that she does not recall seeing the word "rental" circled "or any blue highlighting on any document received at the King dealership."  (*Id.*).  Defendants cite *American Chiropractic Ass'n*, 367 F.3d at 234, as holding that "plaintiff's allegations of mail and wire fraud were insufficient as a matter of law because he could not have justifiably relied on an isolated omission in the agreement where he received another document attached to the agreement that disclosed the very fact he claims was misrepresented." (ECF No. 34-1, at 35).  In that case, however, plaintiff did not contest the authenticity of the additional documents that defendant included with the motion.  Such is not the case here.

Accordingly, drawing all inferences in favor of Plaintiff, the proximate cause element is met at this stage.

### f. Section 1962(a) Claim

Defendants argue that Plaintiff has not pled a violation of Section 1962(a).  To allege a violation of Section 1962(a), a plaintiff must show: (a) receipt of income from a pattern of

racketeering activity, and (b) the use or investment of this income in an enterprise. *See Busby*, 896 F.2d at 837.

Plaintiff asserts that "[t]hrough the use of this illegal and fraudulent scheme, and through their efforts to operate and maintain the enterprise . . . and to facilitate the sale of prior short-term rental vehicles without the disclosures required by Maryland law, Defendants have been able to retain money that is rightfully payable to [] Plaintiff[] and Class members." (ECF No. 22 ¶ 245).  Plaintiff further alleges that Defendants have retained these illegally gained funds and reinvested and used those funds in their operations in violation of 18 U.S.C. § 1962(a).  (*Id.* ¶ 246).  Plaintiff avers that "Defendants each previously acquired illicit funds through similar fraudulent operations involving mail and wire fraud . . . and they used these proceeds to continue their scheme by investing in and operating King Auto Group." (ECF No. 22 ¶ 247).  Plaintiff further asserts that "[t]hrough Defendants' use of the illegal and fraudulent scheme of selling prior short-term rental vehicles without the disclosures required by Maryland law, and through their efforts to operate and maintain the enterprise described herein . . . Defendants have been able both to maintain the enterprise and to profit from it at the expense of Named Plaintiff[] and the Class." (*Id.* at 248).

These conclusory allegations are insufficient to assert a RICO violation under Section 1962(a).  Section 1962(a) prohibits a person from receiving income from a pattern of racketeering activity and then using that income in the operation of an enterprise engaged in commerce.  *See New Beckley Mining Corp.*, 18 F.3d at 1165.  Plaintiff asserts that the King Auto Group is an association-in-fact.  Defendants argue that "Plaintiff[] make[s] no allegation about the manner in which the alleged enterprise received money or how they used it . . . [t]he Complaint is devoid of any factual allegations showing the manner in which profits allegedly received by the Defendants were then used to acquire any interest or invest in the [King Auto Group]."  (ECF No. 34-1, at 42).  Plaintiff alleges that she and other consumers were significantly overcharged for the vehicles sold to them, and that the money from the alleged fraudulent scheme to sell the vehicles without proper disclosure was invested in the enterprise.  She also states that "[e]ach of the Defendants used proceeds derived from a pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5) to acquire an interest in, establish, and operate the enterprise."  (ECF No. 22 ¶ 226).

Without any factual support to buttress these legal conclusions, the allegations are insufficient to survive a motion to dismiss.  Plaintiff does not allege how much was

invested or the contours of the reinvestment of the funds into the King Auto Group operation.  Section 1962(a) applies only in situations where an enterprise is an object or goal of the racketeering activity, not a tool to carry out the racketeering activity.  *See Eason*, 2004 WL 903756, at *1.  In *In re Am. Honda Motor Co., Inc. Dealerships Relations Litig.*, 941 F.Supp. 528, 548-49 (D.Md. 1996), plaintiff offered two allegations of "use or investment" of racketeering proceeds, including: "(1) that corrupt Honda executives used the bribes and kickbacks they received to obtain ownership interests in existing or new dealerships, and (2) that Honda received income in that it was able to pay its executives substantially less than other manufacturers, and that Honda used this income, directly or indirectly to finance its sales and allocation network."  *Id.* at 548-49.  Judge Motz found the allegations sufficient to sustain a claim under Section 1962(a).  He reasoned that the "investment use" injury pleading requirement

> [r]equires allegations under section 1962(a) to be supported by *distinct allegations* of how the use or investment of illicit income played a causative role.  Similarly, the rule against "reinvestment" allegations is not a *per se* rule that the use of proceeds from predicate acts chargeable under section 1962(c) can never support a separate claim under section 1962(a).  Instead, this rule requires only that *plaintiffs do more than allege that income received from one predicate act was used in the operation of an enterprise.*

*Id.* at 549. (emphases added).  Without any specific details about how proceeds from the alleged racketeering activity were used to establish or operate the King Auto Group, the allegations in the amended complaint do not present a plausible claim that Defendants violated Section 1962(a).  Accordingly, this claim will be dismissed against all Defendants.

**4. Section 1962(d)**

Plaintiff also alleges a violation of Section 1962(d), which states, in relevant part, that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  Defendants argue that "[s]ince the Complaint fails to allege any substantive RICO claim under 1962(c), Plaintiffs' conspiracy claim under 18 U.S.C. § 1962(d) alleged in Count X fails as a matter of law." (ECF No. 34-1, at 43).  *See also Walters*, 684 F.3d at 439.  As discussed *supra*, Plaintiff's claims for substantive RICO violations under Section 1962(c) can proceed at this stage, thus this argument is without foundation.

Plaintiff's Section 1962(d) claim fails for a different reason, however.  A RICO conspiracy claim "requires that the plaintiff allege and later prove that the defendants knew of the RICO violations of the enterprise and agreed to facilitate those activities."  *Proctor*, 645 F.Supp.2d at 483.  Judge Titus

reasoned in *Proctor*, 645 F.Supp.2d at 483, also a class action alleging civil RICO violations: "[l]ike other conspiracies, a defendant who agrees to do something illegal and opts into or participates in a conspiracy is liable for the acts of his co-conspirators even if the defendant did not agree to do or conspire with respect to a particular act." However, "[b]ecause the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2$^d$ Cir. 1990).

The amended complaint contains the following allegations:

> Defendants associated together under the King Auto Group moniker to advertise and jointly market themselves, purchased used vehicles that previously had been used as rental vehicles, used and agreed to use misleading form documents in the course of their sales of used vehicles, and agreed to conceal from, and not to disclose to, purchasers the prior rental use of vehicles to advance each Defendant's independent personal gain and individual financial stake in its respective corporation and in the conspiracy.

(ECF No. 22 ¶ 160). Plaintiff further asserts that "Defendants reached an agreement or understanding to conceal from, and fail to disclose to, [] Plaintiff[] and the Class material facts concerning the prior short-term rental use of the vehicles sold." (*Id.* ¶ 177). Plaintiff avers that "Defendants participated in this fraudulent scheme and worked in combination

with each other . . . to facilitate and engage in a conspiracy to deceive and defraud" Plaintiff and members of the class. (*Id.*). Plaintiff also alleges that "Defendants conspired with each other to engage in the various activities set forth herein, agreed to participate in the operation of the conspiracy and scheme to defraud Named Plaintiff[] and Class members, and aided and abetted one another in these activities, all as proscribed by Maryland law." (*Id.* ¶ 79).

These allegations are insufficient to show a violation of Section 1962(d). "As compared with an allegation under general conspiracy law, the objective of a RICO conspiracy is the violation of a substantive RICO provision." *Marshall v. City of Atlanta*, 195 B.R. 156, 169 (N.D.Ga. 1996). As the Fourth Circuit reasoned in *Walters*, 795 F.Supp.2d at 355, "[t]o plead a violation of § 1962(d), a plaintiff must allege that 'each defendant agreed that another coconspirator would commit two or more acts of racketeering.'" (*citing Proctor*, 645 F.Supp.2d at 477)); *Coffee Beanery, Ltd.*, 2012 WL 3728184, at *15 (same). The allegations contained in the amended complaint do not plausibly lead to an inference that each dealership Defendant agreed that another coconspirator would commit predicate acts. Mere conclusory allegations that all Defendants generally conspired or helped each other violate Section 1962(a) or (c) is insufficient. *See, e.g., In re American Honda Motor Co.*, 965

F.Supp. at 723 ("simply assisting in the effectuation of the RICO scheme is not alone sufficient to bring a defendant within the ambit of § 1962(d)."). Plaintiff provides no details regarding when such an agreement was entered into or the contours of any such agreement. As Judge Motz explained in *In re American Honda Motor Co., Inc.*, *id.*, "[i]f the defendant has not himself committed (or directed the commission of) the necessary predicate acts, he must at least have agreed (expressly or impliedly) that someone else do so." The allegations fail to provide notice to Defendants as to how they conspired under Section 1962(d). Accordingly, this claim will also be dismissed against all Defendants.

## B. Abstention

Defendants argue, in the alternative, that the court should abstain from exercising jurisdiction pursuant to the doctrine set forth in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). As the Fourth Circuit explained in *Martin v. Stewart*, 499 F.3d 360, 364 (4th Cir. 2007):

> *Burford* permits abstention when federal adjudication would unduly intrude upon complex state administrative processes because either: (1) there are difficult questions of state law . . . whose importance transcends the result in the case then at bar; or (2) federal review would disrupt state efforts to establish a coherent policy with respect to a matter of substantial public concern.

(internal marks omitted).  Defendants argue that the State of Maryland has a strong interest in having the issues decided in state court.  Defendants explain that "[f]or more than 50 years, the Maryland legislature has set forth a comprehensive scheme with detailed provisions regulating the sale of automobiles, which requires restrictive licensing from the state in order to do business."  (ECF No. 34-1, at 45-46).  Defendants contend that Maryland's legislature has developed a comprehensive legislative and regulatory scheme involving the disclosure requirements for automobile dealers selling cars in the State of Maryland.   Thus, Defendants believe that "the Maryland legislature and the MVA have a strong interest in retaining the power to govern the types of disclosure required to comply with COMAR to ensure dealer accountability in the context of consumer transactions."  (*Id.* at 46-47) (internal citations omitted).

Defendants do not offer compelling reasons to support abstention.  Plaintiff alleges that Defendants engaged in a fraudulent scheme by failing to disclose to consumers the prior short-term rental history of the vehicles that they were systematically selling, in violation of Maryland law.  Although Plaintiff disputes this point, Defendants maintain that the prior short-term rental history of the vehicle was disclosed to Plaintiff in a separate document – namely, the CarFax Report – and that she acknowledged receipt by signing the CarFax Report

66

in multiple places. Defendants do not identify difficult questions of state law whose importance transcends the results of the case at bar. In any event, federal courts frequently apply state law principles in resolving disputes. Moreover, the mere presence of a complex state or local regulatory scheme does not mandate abstention. *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989). As Judge Quarles reiterated in *Haak Motors LLC v. Arangio*, 670 F.Supp.2d 430, 433-34 (D.Md. 2009), "[a]bstention doctrines constitute extraordinary and narrow exceptions to a federal court's duty to exercise the jurisdiction conferred on it." (*quoting Martin v. Stewart*, 499 F.3d 360, 363 (4th Cir. 2007)). As Plaintiff points out, this case does not involve the proceedings or orders of a Maryland administrative agency. Although Defendants argue that the Department of Transportation in the State of Maryland has vested the MVA with the authority to interpret and enforce the disclosure provisions in COMAR 11.12.01.14(M)(1), Defendants fail to identify how federal review would disrupt Maryland's efforts to establish a coherent policy concerning a matter of substantial public concern. Moreover, the fact that Judge Garbis recently adjudicated *Bailey*, 2014 WL 204262 – a putative class action against car sellers alleging the same violations asserted here – further counsels against *Burford* abstention.

Accordingly, *Burford* abstention is inapplicable given the facts of the case.

### C. Standing to Sue the Other Dealer Defendants for the Non-Rico Claims

The Other Dealer Defendants argue that Plaintiff lacks standing to sue them. (ECF No. 37-1, at 32).[12]  The Other Dealer Defendants contend that "Plaintiff[] ha[s] no standing to assert claims against the Unrelated Defendants, who did not sell them any vehicle, who owed them no duty, and with whom they have utterly no connection." (*Id.* at 33).  Although Plaintiff acknowledges that she had no commercial dealings with the Other Dealer Defendants, she asserts that all of the Defendants conspired with each other "in the transactions of Named Plaintiff[] and Class members" and are thus liable for the alleged violations.

---

[12] As mentioned *supra*, the Other Dealer Defendants have not argued that the undersigned lacks standing over the RICO claims either in their initial motion to dismiss the federal claims or in their reply brief.  They first raise standing as the very last argument in their motion to dismiss or, in the alternative, for summary judgment. (*See* ECF No. 37-1, at 32).  They state that "[s]ince the Plaintiffs fail to allege any legal duty owed to them by any of the [Other Dealer] Defendants, they have no standing to assert *these claims* against them," presumably referencing the state law claims briefed in the motion to dismiss or for summary judgment.  Notably, the Other Dealer Defendants argue in their motion to dismiss the federal claims that the court lacks subject matter jurisdiction over the MMWA claim; they do *not* raise standing as an issue as to the RICO claims in the same motion.

Standing is a threshold jurisdictional requirement. *See Central Wesleyan College v. W.R. Grace & Co.*, 6 F.3d 177, 188 (4th Cir. 1993) ("standing is a jurisdictional issue, and courts should attempt to resolve such issues as soon as possible."). The Supreme Court has consistently required that a litigant have "standing" to challenge the action sought to be adjudicated in federal court. *Valley Forge*, 454 U.S. at 471. "In order to have standing, a plaintiff must demonstrate some actual or threatened injury as a result of the putatively illegal conduct of the named defendant, and must show that the injury can be fairly traced to the challenged action and that the injury is likely to be redressed by a favorable decision." *Herlihy v. Ply-Gem Industries, Inc.*, 752 F.Supp. 1282, 1290 (D.Md. 1990); *see also Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91 (1979). "The constitutional limits on standing result in the elimination of a claim in which the plaintiff has failed to make out a case or controversy between himself and the named defendant." *Herlihy*, 752 F.Supp. at 1290. As the Supreme Court noted:

> That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class "must allege and show that they personally have been injured, not that injury has been suffered by other unidentified members of the class to which they belong and which they purport to represent."

*Lewis v. Casey*, 518 U.S. 343, 357 (1996) (alteration in original) (*quoting Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n. 20 (1976)).

Judge Garbis reasoned in *Bailey*, 2014 WL 204262, at *3, that "[t]he United States Court of Appeals for the Fourth Circuit has echoed this outlook, stating that in the class action context, it 'is essential that named class representatives demonstrate standing through a requisite case or controversy between themselves personally and' *each* defendant." (emphasis added) (*quoting Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 188 (4th Cir. 1993)); *Lieberson v. Johnson & Johnson Consumer Co., Inc.*, 865 F.Supp.2d 529, 537 (D.N.J. 2011) (holding that the plaintiff lacked standing to pursue putative class action claims of consumer fraud against a baby bath product manufacturer as to any products the named plaintiff did not allege she used or purchased). The fact that members of the putative class may assert claims against the Other Dealer Defendants does not confer standing on Plaintiff to sue the Other Dealer Defendants. As noted in *Miller v. Pacific Shore Funding*, 224 F.Supp.2d 977, 995-96 (D.Md. 2002), "[a]bsent a contractual relationship with any of these defendants, the plaintiffs cannot possibly show that their injuries, such as they have suffered, are traceable to the conduct of any of these

defendants. . . . Their categorization of their suit as a putative class action in no way cures this defect."

Plaintiff argues that "a conspiracy [among all of the Defendants] confers standing with respect to each Defendant." (ECF No. 48, at 107). Her theory is that the Other Dealer Defendants are liable as co-conspirators with King Buick GMC because all of the Defendants reached an agreement and/or understanding concerning the written disclosures to be made to Named Plaintiff and members of the putative class and regularly concealed the fact that the vehicles they sold were prior short-term rentals, in violation of Maryland law. In a situation where a named plaintiff did not deal directly with the named defendants, "a plaintiff may be able to satisfy the injury aspect of standing through sufficient allegations of conspiracy." *See Cent. Wesleyan Coll.*, 6 F.3d at 188 ("[w]hile allegations of conspiracy among parties with whom a plaintiff did not directly deal may confer standing upon the plaintiff to sue the nondealing parties,[], the Supreme Court has emphasized that indirectness of injury, though not fatal to standing, 'may make it substantially more difficult to meet the minimum requirement of Art. III,' *Warth v. Seldin*, 422 U.S. 490, 505 (1975)."); *Brown v. Cameron-Brown Co.*, 652 F.2d 375, 378 (4th Cir. 1981) ("[w]e are in full accord with the district court that when plaintiffs alleged injury as a result of a conspiracy

71

in which the non-dealing defendants participated, plaintiffs have alleged standing to sue the non-dealing defendants.").

Plaintiff has not adequately pled the existence of a conspiracy. A civil conspiracy is "'a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages *to the plaintiff*.'" *Hoffman v. Stamper*, 385 Md. 1, 24 (2005) (citation omitted) (emphasis added). The key question in assessing whether a conspiracy theory has been adequately pled is whether there is adequate factual support for the existence of an agreement to conspire. *DB Capital Grp.*, 2011 WL 887554, at *6; *Brady v. Livingood*, 260 F.Supp.2d 94, 104 (D.D.C. 2004). A clear agreement to conspire is necessary because the "[i]ndependent acts of two wrongdoers do not make a conspiracy." *Murdaugh Volkswagen, Inc. v. First Nat. Bank of South Carolina*, 639 F.2d 1073, 1076 (4th Cir. 1981). Detrimental to Plaintiff's conspiracy claim here is the requirement that "plaintiff must set forth more than just conclusory allegations of [the] agreement." *Brady*, 360 F.Supp.2d at 104. The complaint should include factual allegations that provide an indication of when and how the agreement was brokered and how each of the defendants specifically were parties to the agreement. *DB*

*Capital Group*, 2011 WL 887544, at *6; *Acosta Orellana v. CropLife Int'l*, 711 F.Supp.2d 81, 113-14 (D.D.C. 2011).

Here, the dealerships Defendants are separate businesses. Plaintiff asserts that:

> Defendants reached an agreement and/or understanding concerning the written disclosures to be made to Named Plaintiff[] and the Class in connection with their vehicle purchases and failed to make the written disclosures required by Maryland law in furtherance of their conspiracy for their own personal gain, advantage and profit, resulting in legal damage to Named Plaintiff[] and Class.

(ECF No. 22 ¶ 208). She further asserts that "Defendants conspired among themselves, by agreement and understanding, to engage in the unlawful acts and omissions described herein." (*Id.* ¶ 5). Plaintiff provides no details as to when such an agreement was reached or the contours of the agreement. Furthermore, Plaintiff does not reference when King Buick GMC met or communicated with other members of the alleged conspiracy. *Cf. DB Capital Grp.*, 2011 WL 887544, at *7 (finding conspiracy allegations sufficient where plaintiff's complaint referenced specific instances when alleged co-conspirators met and engaged in acts to defraud plaintiff). Plaintiff attempts to show standing over the Other Dealer Defendants on the premise that the Other Dealer Defendants similarly defrauded other consumers who are members of the putative class. This is not a

true conspiracy. Plaintiff's allegations supporting a conspiracy among the Defendants include: (1) the dealerships jointly marketing and selling vehicles and developing form documents such as the Buyer's Order used at each dealership; (2) using the same forms and same allegedly deceptive practices to misrepresent the prior rental use of the vehicles sold to consumers; (3) marketing each other's used vehicles on their websites; (4) agreeing to offer CarFax Reports on used vehicles owned by other Defendants; (5) agreeing to jointly advertise and advertising for sale identical vehicles with the identical vehicle identification numbers simultaneously on more than one Defendant's website; and (6) referring customers to each other's websites. (ECF No. 48, at 33-35). The fact that the Defendants marketed and advertised the same vehicles, used the same sales agreements without making the allegedly requisite disclosure, and offered CarFax Reports in connection with vehicles owned by Other Dealer Defendants suggests concerted action, not conspiracy; indeed, the plausible inference from the allegations contained in the amended complaint as to civil conspiracy is that the Other Dealer Defendants violated Maryland law with respect to disclosures regarding a vehicle's prior use in the same way as King Buick GMC through concerted action.

The analysis in *Herlihy*, 752 F.Supp. at 1290, is instructive. That case involved a putative class action by a

group of homeowners against manufacturers of fire retardant plywood products, alleging that the products were defective. The court reasoned:

> Nowhere in the complaint is there an allegation that a named plaintiff suffered any injury or damage because of the wrongful act or conduct of a named defendant. Rather than relying on any allegation in the complaint of a specific injury [caused by a named defendant], plaintiffs contend that they have standing to sue under a so-called "concert of action" theory. Plaintiffs argue that a defendant may be liable for an injury caused by the product of another if the plaintiff can prove that multiple defendants acted tortuously pursuant to a common plan or design. [] Plaintiffs contends that they have sufficiently alleged in this case a concert of action and that therefore they have standing to sue the six named defendants.

*Id.* The court rejected this argument, noting that Maryland law does not recognize a cause of action based upon an alleged concert of action.  Here, although Plaintiff uses the word "conspiracy" in the amended complaint, the factual allegations support the inference of concerted action among the Defendants, which does not confer standing.  Indeed, the amended complaint alleges that "when King Buick failed to disclose and concealed from [] Ms. Chambers the prior rental use of the vehicle[] [she was] purchasing, it did so as part of a conspiracy, scheme and *concerted action* in which all of the Defendants participated with their knowledge and consent, as well as with the aid and

75

encouragement of one another." (ECF No. 22 ¶ 60; *see also* ¶ 16 ("The King Auto Group entities named as Defendants acted in concert to accomplish, and jointly benefitted from, the scheme described herein.")); *Sprint Nextel Corp. v. Simple Cell, Inc.*, Civil No. CCB-13-617, 2013 WL 3776933, at *5 (D.Md. July 17, 2013) ("[t]he mere involvement or encouragement of lies made by others is neither sufficient to maintain a fraud action under Maryland law, . . . nor specific enough to maintain a claim under Rule 9(b).").

The allegations are insufficient to show a conspiracy among all of the Defendants.  In *Acosta*, 711 F.Supp.2d at 114, the court dismissed a civil conspiracy claim because the plaintiff failed to provide any factual support that the defendant CropLife had an agreement with the other defendants and found that it was just as likely that they were acting independently with a common motivation or goal.  This is the case here. Moreover, the Other Dealer Defendants submit an affidavit from Gerard Ceresini, the Controller of King Buick GMC, in which he stated that the Other Dealer Defendants "had no involvement in the sale of this vehicle to [] Ms. Chambers, or the disclosures given, or not given, by King Buick GMC to them." (ECF No. 37-7 ¶ 11).  He further declares that "[t]here was no agreement between King Buick GMC and these Unrelated Dealerships relating to the sale of . . . the 2010 Dodge Caliber SX2 to Ms. Chambers

to make, or not to make, any disclosures regarding prior rental car history of the vehicle purchased by them." (*Id.* ¶ 12).  He also contends that "King Buick GMC is not involved in the manner or method in which the Unrelated Dealerships purchase or sell their own used car inventory." (*Id.* ¶ 13); (*see also id.* ¶¶ 14-16).  He states that "King Buick GMC, like most Maryland automobile dealer, even competing dealerships, advertise their inventory on common 'websites' and they do not share profits or expenses with one another." (*Id.* ¶ 17).  The Other Dealer Defendants also submit an affidavit from Jason Carroll, an employee of King Buick GMC, with personal knowledge of the transaction involving the sale of the vehicle to Ms. Chambers. (*See* ECF No. 37-8).  He states that the Other Dealer Defendants had "no involvement in the sale of this vehicle to Ms. Chambers, or the disclosures for this vehicle.  . . . I did not know what forms, documents, practices or methods were being used by these other 4 automobile dealerships to disclose, or not to disclose, prior short term rentals to their customers." (*Id.* ¶ 5).  The Other Dealer Defendants explicitly deny the existence of an agreement among the Defendants to commit any unlawful acts against Plaintiff. (*See* ECF No. 55, at 21 ("Chambers' entire conspiracy theory also fails because it is not factually or logically plausible . . . The problem with her theory is that it is untrue.")); *Higdon v. Lincoln Nat. Ins. Co.*, Civ. Action No.

ELH-13-2152, 2014 WL 1630210, at *3 (D.Md. Apr. 21, 2014) (noting that a factual challenge to subject matter jurisdiction asserts that the jurisdictional allegations of the complaint are not true and the court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction); *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (same). Aside from conclusory allegations of a conspiracy among the Defendants, the allegations in the amended complaint do not explain how the Other Dealer Defendants were involved in the scheme that defrauded Plaintiff in her purchase of the vehicle. Accordingly, there is no standing over the Other Dealer Defendants and Counts I through VII against them will be dismissed.[13]

---

[13]   In *Bailey*, 2014 WL 204262, at *4, also a putative class action against dealership Defendants with nearly identical facts, Judge Garbis stated that the complaint included allegations "that present a plausible claim that Heritage, the Other Dealer Defendants, and Atlantic acted in concert pursuant to an agreement to accomplish an unlawful purpose of selling prior rental cars without disclosing that information to customers, one of whom was Bailey, who sustained damage as a result." Judge Garbis thus concluded that named plaintiff would have a valid conspiracy claim against the other dealer defendants "if it were not for the fact that Heritage and each of the Other Dealer Defendants was a 100%-owned subsidiary of Atlantic." Judge Garbis did not undertake extensive analysis as to which allegations in the complaint he found sufficient to establish the existence of an agreement among the defendants to confer standing. He did not need to because he found the intracorporate conspiracy doctrine barred the claims against the other non-dealing defendants.

**D. Subject Matter Jurisdiction over the Magnuson-Moss Warranty Act (Count II)**

Defendants assert that this court lacks subject matter jurisdiction over the MMWA claim because the amended complaint fails to allege any amount of damages and, even if it did, Plaintiff and members of the class still could not plausibly allege $50,000 in damages under their separate MMWA claims. (ECF No. 34-1, at 16-17). Defendants further argue that Plaintiff cannot meet the jurisdictional "100-named plaintiff" requirement under 15 U.S.C. § 2301(d)(3)(C).

A plaintiff may file a MMWA suit for damages for certain breach of warranty obligations in either state or federal court.

---

Plaintiff submitted a Notice of Supplemental Authority on April 30, 2014, alerting the undersigned to an order issued in the Circuit Court for Baltimore County related to another class action, *Buie v. Antwerpen Motorcars, Ltd.*, Case No. C-13-12341, that alleges that a group of automobile dealerships failed to disclose the prior short-term rental use of vehicles offered for sale. (*See* ECF No. 71). Plaintiff asserts that the Antwerpen Auto Group Defendants included all nine of the Antwerpen dealers as defendants, but named plaintiffs' transactions were with only three of those entities. (ECF No. 71, at 2). Plaintiff submits a two-page order from the Circuit Court for Baltimore County. The order states that "[t]he facts alleged here, in Plaintiffs' Amended Complaint, are sufficient to establish the existence of a civil conspiracy, and thus sufficient to establish the standing of these [p]laintiffs to sue these [d]efendants." (ECF No. 71-1, at 1). This order, of course, is not binding precedent on this court. Moreover, the court did not explain its reasoning.

Accordingly, the undersigned does not find these decisions controlling on the issue of standing against the Other Dealer Defendants in this matter.

15 U.S.C. § 2301(d)(1).   Such a suit, however, is not appropriately brought in a United States district court:

> (A) If the amount in controversy of any individual claim is less than the sum or value of $25;
>
> (B) If the amount in controversy is less than the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit; or
>
> (C) If the action is brought as a class action, and the number of named plaintiffs is less than one hundred.

15 U.S.C. § 2310(d)(3); *Misel v. Mazda Motor of Am., Inc.*, 420 F.App'x 272, 273-73 (4th Cir. 2011).   Here, Latechia Chambers is the only putative Named Plaintiff and it does not appear that the jurisdictional requirement is met.   Plaintiff maintains that "where an alternate basis for federal jurisdiction exists – as where violations of a federal statute such as RICO have been alleged – federal jurisdiction may be maintained over a Magnuson-Moss claim, irrespective of the number of named plaintiffs and the jurisdictional amount at issue in the Magnuson-Moss claims."   (ECF No. 48, at 82).

The court has subject matter jurisdiction over the MMWA claim because one of the RICO counts will not be dismissed at this time.   As Judge Ellis reasoned in *Barnes v. West, Inc.*, 249 F.Supp.2d 737, 739 (E.D.Va. 2003), "MMWA claims that cannot independently be heard in federal court owing to the absence of

the requisite amount in controversy, can still be heard in federal court in circumstances where supplemental jurisdiction is properly exercised under 28 U.S.C. § 1367." In such circumstances – as here – the amount in controversy and "100 named plaintiff" requirements are no obstacles to the claim being heard in federal court because the court can exercise supplemental jurisdiction over the MMWA claim provided another jurisdictional basis exists. *See Chavis v. Fidelity Warranty Servs., Inc.*, 415 F.supp.2d 620, 623 (D.S.C. 2006) ("many courts have allowed federal jurisdiction to be maintained over Magnuson-Moss claims that fail to conform to the strict limitations of § 2301(d)(3) when an alternate basis for federal jurisdiction exists."). Defendants' argument assumes that the RICO claims will be dismissed, but at this stage, the Section 1962(c) claim can proceed. Because the RICO claim provides an alternative jurisdictional basis, there is subject matter jurisdiction over the MMWA claim.

## E.  The MMWA and Implied Warranty of Merchantability Claims (Counts I & II)

Plaintiff asserts a claim for breach of implied warranty of merchantability and seeks relief under both federal law, the MMWA, and state law: Section 2-314 of the Uniform Commercial Code, as codified at Md. Code Ann. § 2-314. Resolution of Plaintiff's claims for breach of implied warranty of

merchantability and violation of the MMWA turns largely on principles of state law. *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 291 (4th Cir. 1989); *Laing v. Volkswagen of Am., Inc.*, 180 Md.App. 136 (2008); *Ingram v. Auto Palace, Inc.*, No. BPG-09-2660, 2012 WL 5077633, at *4 (D.Md. Oct. 17, 2012) ("[t]he Fourth Circuit has recognized that the Magnuson-Moss Warranty Act operates in conjunction with state law to regulate the warranting of consumer products."). In a Maryland warranty action, the plaintiff must show that a warranty existed, that the product did not conform to the warranty, and that the breach proximately caused the injury or damage. *Lloyd v. Gen. Motors Corp.*, 397 Md. 108 (2007). The Maryland Uniform Commercial Code governs actions asserting breaches of express or implied warranties for transactions in goods. *See* Md. Code Ann., Com. Law § 2-102. Section 2-314(1) states that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." The code further explains that "goods to be merchantable must be at least such as (a) pass without objection in the trade under the contract description; . . . and (c) are fit for the ordinary purposes for which such goods are used." § 2-314(2).

Here, Plaintiff invokes Section 2-314(2)(a), alleging that:

> [u]nder both a consumer's reasonable
> expectations as well as trade quality
> standards, a vehicle with a prior rental

82

> history that is not clearly and
> conspicuously disclosed cannot pass without
> objection in the trade under the contract
> description and simply is not merchantable
> under Maryland law. A significant segment
> of the buying public would object to
> purchasing a used vehicle previously used as
> a short-term rental vehicle.

(ECF No. 22 ¶ 134). Defendants argue that absent allegations of any physical defect in the vehicle sold to Plaintiff, there can be no cause of action for breach of implied warranty of merchantability or violation of the MMWA. (ECF No. 36, at 15).

There is a long history of applying the implied warranty of merchantability in the used car context. *Jones v. Koons Automotive, Inc.*, 752 F.Supp.2d 670, 685 (D.Md. Nov. 5, 2010). Even so, most – if not all – of these cases contemplate physical defects in automobiles that offend the expectations of reasonable consumers. Indeed, the Fourth Circuit has construed the implied warranty to reach only those defects:

> The difficulty is that, so far as these
> plaintiffs are concerned, GM's diesel-
> equipped cars have served the traditionally
> recognized purpose for which automobiles are
> used. Since cars are designed to provide
> transportation, the implied warranty of
> merchantability is simply a guarantee that
> they will operate in a safe condition and
> substantially free of defects. Thus, where
> a car can provide safe, reliable
> transportation, it is generally considered
> merchantable.

*Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 297 (4th Cir. 1989).

*Carlson* rejects the argument that the implied warranty of

merchantability is meant to protect mere consumer expectations that a product holds its value, absent some tangible defect so substantial as to render the automobile virtually useless. *Carlson*, 883 F.2d at 298; *Ingram*, 2012 WL 5077633, at *9 ("[t]he implied warranty of merchantability warrants both that the vehicle will operate effectively and will provide reasonably safe transportation. . . . There is no evidence, however, establishing that a vehicle's inability to pass state inspection is equivalent to a finding of a vehicle's inoperability.").

In *Koons*, 752 F.Supp.2d at 685, plaintiff's claim for breach of the implied warranty of merchantability was dismissed on nearly identical facts as here. Plaintiff argues that "[i]n *Koons*, this Court concluded a buyer did not state a claim for breach of the Implied Warranty of Merchantability where the buyer alleged the dealer failed to disclose the vehicle's rental history because the vehicle was not 'unfit for use.'" (ECF No. 48, at 89). Plaintiff mischaracterizes the holding in *Koons*. To the contrary, the plaintiff in *Koons*, 752 F.Supp.2d at 685, alleged a breach of the implied warranty of merchantability, "as the 2007 Pontiac G6 would not pass without objection in the trade because the contract description [did not] include a clear and conspicuous disclosure that [the Pontiac G6] had previously been used as a short-term rental." (internal citations omitted). This argument was rejected, however, because there was no

suggestion that the car had any physical defect or was otherwise functionally useless.  Plaintiff argues that the fact that "a dealer will *not* accept a trade-in vehicle from a buyer without first obtaining a signed statement from the buyer certifying, among other things, the existence of any former rental use of a trade-in establishes that accurate disclosure of prior use is needed for a vehicle to 'pass without objection in the trade.'" (ECF No. 48, at 88).  Plaintiff asserts that "[]otherwise, it would not be common practice in the automobile industry for car dealers to require buyers trading in their used vehicles to provide such information."  (*Id.* at 89).  Plaintiff cites no case law from this district to support this contention.  In *Bailey*, 2014 WL 204262, at *11, Judge Garbis noted that:

> [t]he Maryland appellate courts have not yet addressed directly whether a vehicle can be considered non-merchantable under §2-314(2) in the absence of a claim that the car suffers from some tangible defects (*i.e.,* a design or manufacturing defect) or has some concrete physical problem that renders it of a lesser quality than other cars of the same contract description.

Judge Garbis stated that "[t]he Court doubts – in the absence of Maryland precedent supporting [plaintiff's] position – that there would be a valid claim based upon a violation of an implied warranty of merchantability."  Although Judge Garbis ultimately decided not to dismiss this claim because he found viable the other claims premised on the same facts, the

undersigned declines to keep the implied warranty of merchantability and MMWA claims on this basis.

Plaintiff has submitted a notice of supplemental authority, including a transcript from a proceeding before the Circuit Court for Baltimore City (Case No. 03-C-13-008147), another putative class action against dealerships. (*See* ECF No. 64-1). In ruling on a motion to dismiss the implied warranty of merchantability claim in that case, Judge Stringer Jr. decided to follow Judge Garbis's lead, stating: "I am just going to do what Judge Garbis did and said, since the rest of it I'll allow to go forward, I'll let that to go forward, too." (*Id.* at 8). The undersigned, however, sees no reason to depart from the holding in *Koons* on nearly identical facts. *See also Renauer v. Discovery Creek Children's Museum of Washington, Inc.*, Civ. Action No. 09-0140, 2011 WL 826806 (D.Md. Mar. 7, 2011) (dismissing warranty of merchantability claims where "[p]laintiffs have not identified any defects in the slide that would constitute a breach of the implied warranty of merchantability nor have they provided any evidence to show how defects in the slide were the cause of the [] injuries."). Accordingly, Plaintiff's claims for breach of the implied warranty of merchantability and violation of the MMWA will be dismissed.

### F.  Negligent Misrepresentation (Count VI)

Plaintiff asserts a negligent misrepresentation claim.  She alleges that:

> Defendants negligently omitted and failed to disclose the material facts that the vehicles sold to Named Plaintiff[] and the Class previously had been used as short-term rental vehicles, negligently misrepresented that the vehicles sold to them previously were used for consumer purposes only, negligently misrepresented the condition, quality and standard of the vehicles, [and] negligently failed to disclose that the price of the vehicles did not accurately reflect their value.

(ECF No. 22 ¶ 200).  To state a claim for negligent misrepresentation under Maryland law, Plaintiff must show:

> (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

*Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 136 (2007).

King Buick GMC argues that Plaintiff fails to state a negligent misrepresentation claim because King Buick GMC did not make any misrepresentations or omissions.  King Buick maintains that it disclosed to Plaintiff in a CarFax Report in multiple

places that the vehicle she was purchasing was a prior short-term rental. King Buick GMC further asserts that because Plaintiff received the CarFax Report which disclosed that the vehicle was previously used as a short-term rental, she could not have justifiably relied on any alleged misrepresentations in the Buyer's Order. It includes as an exhibit to its motion to dismiss a copy of a CarFax Report allegedly furnished to Ms. Chambers, showing that the word "rental" is highlighted in blue and Ms. Chambers's initials are contained next to this purported disclosure. (*See* ECF No. 36-5).

There are several problems with King Buick GMC's arguments. First, King Buick GMC has moved to dismiss. As indicated above, as a general rule, extrinsic evidence should not be considered at the 12(b)(6) stage. The Fourth Circuit has held that "when a defendant attaches a document to its motion to dismiss, "a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity." *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). Here, Plaintiff challenges the authenticity of the CarFax Report provided by King Buick GMC as an exhibit. Ms. Chambers declares:

> I understand that King has filed a motion with the Court which tells the Court that it has a copy of a Carfax report for my car and

Case 8:13-cv-02347-DKC   Document 80   Filed 09/02/14   Page 89 of 114

> claims that I initialed it in two places. .
> . . I do not recall anyone at the dealership
> showing me a Carfax report or asking me to
> sign or initial it, though I do recall
> signing quite a few documents wherever the
> King rep put an "x" mark next to a line for
> signature, *but the Carfax report was NOT one
> of those documents.*

(ECF No. 48-2, at 33) (emphasis added).  Plaintiff avers that

she "further understand[s] that King has told the Court that the

word 'rental' was circled and highlighted in blue when the

Carfax report was presented to [her].  This cannot be true."

(*Id.*).  Accordingly, to the extent King Buick GMC maintains that

Plaintiff could not have justifiably relied on any

representations in the Buyer's Order given the conflicting

information in the CarFax Report, this argument is unavailing at

this stage of the proceedings because Plaintiff disputes the

authenticity of the CarFax Report that King Buick GMC proffers.[14]

---

[14] In her affidavit, Ms. Chambers also states:

> King put a copy of various documents in an
> envelope for me to take home.  Upon
> returning home with the car, I sometime
> later looked at what was in the envelope.
> When I did, I was surprised to find a
> folded-up copy of a Carfax report among my
> documents.

(ECF No. 48-2, at 33).  Plaintiff submits the CarFax Report that
she allegedly received in the envelope from King Buick GMC,
which is not initialed and the disclosure regarding the
vehicle's prior use as a short-term rental is not highlighted
(unlike the CarFax Report that Defendant proffers).  (*Id.* at 36-
38).  Thus, the authenticity of the CarFax Report that King
Buick GMC provides is disputed.

The amended complaint states that King Buick negligently omitted and failed to disclose *altogether* that the vehicle sold to Plaintiff was a prior short-term rental. (ECF No. 22 ¶ 200). The amended complaint further states that she relied on the false representation and omission in the Buyer's Order by entering into a sales agreement for a vehicle that was of a lesser value and quality than that represented by King Buick GMC. (*Id.* ¶ 204). Viewing the facts in the light most favorable to Plaintiff, she has stated a negligent misrepresentation claim against King Buick GMC.

King Buick relies on *American Chiropractic*, 367 F.3d at 235, for the proposition that where plaintiff receives another document attached to the agreement that discloses the very terms she claims were misrepresented or omitted, she cannot claim negligent misrepresentation or fraud. The facts of *American Chiropractic* are readily distinguishable. In that case, the Fourth Circuit held that plaintiff could not have relied on a misrepresentation by defendant because, unlike here, there was no dispute that plaintiff received the second document with the pertinent disclosure. Here, Plaintiff alleges that she did not receive a document before she purchased the vehicle from King Buick GMC that disclosed that the car was a prior short-term rental. In *Jones*, 752 F.Supp.2d at 686, the undersigned denied defendant's motion to dismiss the negligent misrepresentation

claim where plaintiff alleged that defendant failed to disclose the prior use of a purchased vehicle as a daily rental. Accordingly, the negligent misrepresentation claim against King Buick GMC will not be dismissed at this time.

### G.  Deceit by Non-Disclosure or Concealment (Count IV)

Count IV of the complaint alleges deceit by non-disclosure or concealment.  This count "comprises two similar, yet distinct, claims sounding in fraud." *Bourgeois v. Live Nation Entm't, Inc.*, Civ. Action No. ELH-12-cv-00058, 2014 WL 936841, at *32 (D.Md. Mar. 10, 2014); *Fegeas v. Sherrill*, 218 Md. 472, 476 (1958) ("Concealment and non-disclosure are closely related and in any given situation usually overlap.").  The elements of fraudulent concealment are:

> (1) the defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment.

*Blondell v. Littlepage*, 413 Md. 96, 119 (2010).  "'To create a cause of action, concealment must have been intentional and effective – the hiding of a material fact with the attained object of creating or continuing a false impression as to that fact.  The affirmative suppression of the truth must have been with intent to deceive.'"  *Fegeas*, 218 Md. at 476-77 (citation

omitted).   With respect to active suppression or concealment of facts, fraudulent concealment "is any statement or other conduct which prevents another from acquiring knowledge of a fact, such as diverting the attention of a prospective buyer from a defect which otherwise, he would have observed." *Lloyd*, 397 Md. at 138.   A claim for deceit by nondisclosure "requires only that the defendant remain silent about, or omit, facts." *Lloyd*, 397 Md. at 38 n.11.   The non-disclosed fact must be material, which means it must be one on which a reasonable person would rely in making a decision. *Sass v. Andrew*, 152 Md.App. 406, 430 (2003). Like a claim for fraudulent concealment, a claim for deceit by nondisclosure will only lie if "the defendant had a duty to disclose." *Id; Bourgeois*, 2014 WL 936841, at *33.   Maryland ordinarily does not impose a general duty on every party to a transaction to disclose facts to the other party. *Sass*, 152 Md.App. at 430.   Maryland law also recognizes that, though, even where there is no duty to disclose, a person who suppresses or conceals facts that materially qualify other representations that person has made may be found liable for fraud. *Hogan v. Maryland State Dental Ass'n*, 155 Md.App. 556, 567 (2004). Claims of fraud must be pled with particularity, as noted above.

Unlike the negligent misrepresentation claim, this claim requires Plaintiff to plead *scienter*.   King Buick GMC argues that it did not make any intentionally false statement or

conceal anything from Plaintiff because it clearly disclosed in the CarFax Report the prior short-term rental use of the vehicle it sold to Ms. Chambers. (*See* ECF No. 36-1, at 23-24).   King Buick GMC avers that "[b]y providing Plaintiff[] with the CarFax Report, with the 'Title History' and 'Ownership History' disclosing that [her] vehicle was a prior rental in five different places, King Buick GMC intended to and did in fact accurately disclose the true title history of the vehicle before it was sold." (ECF No. 36-1, at 23-24).   King Buick GMC points to guidance from the Maryland MVA stating that disclosures regarding a vehicle's prior use do not need to be made on the Buyer's Order and the disclosure can be made on a separate document. (*See* ECF No. 36-6, at 2 (MVA Bulletin, Aug. 25, 2011)); *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (in reviewing motions to dismiss, the court may consider matters of public record).   The guidance from the Maryland MVA states that "[t]he MVA does not limit which document must contain the required disclosures.  Best practices are to provide disclosure in a writing that is attached to the sales order and may be attached to the [retail installment sales contract] if there is one." (*Id.* at 3 (MVA Bulletin, June 21, 2013)).   King Buick GMC further contends that Plaintiff cannot show justifiable reliance because she knew or is presumed to have known that the vehicle was a prior rental by looking at the

CarFax Report she "signed which disclosed this fact in five different places." (ECF No. 36-1, at 27). Plaintiff counters that King Buick GMC's own contract "told Ms. Chambers she should rely on no representation outside the four corners of her Buyer's Order, including on any documents – like a Carfax – not signed by the dealer." (ECF No. 48, at 97). Specifically, the Buyer's Order Ms. Chambers executed stated: "I (we) understand that there are no other agreements, express warranties or representations, except as stated above and on the back, and I (we) agree to the terms of this agreement." (ECF No. 22-2, at 2). Plaintiff asserts that King Buick GMC fraudulently concealed the fact that the vehicle Ms. Chambers purchased was a prior short-term rental by failing to disclose this fact on the Buyer's Order in the designated space therein designed to put consumers on notice of the vehicle's prior use.

This claim will not be dismissed at this time. The parties dispute whether Ms. Chambers received a CarFax Report in connection with her transaction and, if she did, at what point (before or after the purchase transaction was consummated) it was provided and whether Ms. Chambers signed it. On a motion to dismiss, Plaintiff's allegations in the amended complaint must be credited given that she disputes the authenticity of the CarFax Report that King Buick GMC submits. According to the amended complaint, when King Buick GMC sold to Plaintiff the

used 2010 Dodge Caliber on February 18, 2012, it failed to disclose to her that this vehicle had been used as a short-term rental. She asserts that by concealing the prior short-term rental use of the vehicle, King Buick GMC intended to induce her to purchase a less desirable and less valuable vehicle and to pay more for the vehicle than it was worth. (ECF No. 22 ¶¶ 175, 182). Defendant argues that Plaintiff cannot show that King Buick GMC *intended* to conceal the prior short-term rental use of the vehicle as part of a scheme to defraud her. Although Plaintiff certainly has to make this showing to ultimately prevail on this claim, at this stage, intent, knowledge, and other conditions of a person's mind may be alleged generally." *United States ex rel. Palimieri v. Alpharma, Inc.*, Civ. Action No. ELH-10-1601, 2014 WL 1168953, at *7 (D.Md. Mar. 21, 2014).

King Buick GMC relies on *McGraw v. Loyola Ford, Inc.*, 124 Md.App. 560, 579 (1990), to support the argument that the omission in the Buyer's Order does not "vitiate the dealer's affirmative act of timely disclosing that the vehicle was a prior rental in the CarFax Report." (ECF No. 56, at 8 (internal citation omitted)). Unlike here, in *McGraw*, 124 Md.App. at 580, it was "*uncontroverted* that, at the time of the transaction, [plaintiff] was expressly informed that the vehicle had been used as a 'demo.'" The court in *McGraw*, *id.*, reasoned:

> Indeed, during his deposition, appellant admitted that Loyola Ford *told* him prior to signing the first buyer's order that it was a demonstrator vehicle.   [Plaintiff] also knew that the car had been driven 6,161 miles, and the dealer noted the exact mileage on the same form that erroneously described the vehicle as "new."   In addition, the first buyer's order form was replaced with a second form a few days later, *before the transaction was consummated*.   On the second form, the dealer correctly described the vehicle as a demo.

(emphasis added).   Thus, the facts of McGraw are readily distinguishable, as Plaintiff alleges that King Buick GMC did not make the requisite disclosure regarding the vehicle's prior rental use before she consummated the transaction – and Plaintiff's allegations must be accepted as true at this juncture.   Plaintiff has identified the time, place, and content of the false representation, which is sufficient under Rule 9(b).   Accordingly, Count IV against King Buick GMC will not be dismissed at this time.

### H.   Maryland Consumer Protection Act ("MCPA") (Count III)

Count III of the amended complaint alleges violations of the MCPA.   The MCPA prohibits "unfair or deceptive trade practices."   Md. Code Ann., Com. Law, § 13-301.   The MCPA proscribes fourteen categories of unfair or deceptive practices, including "any . . . [f]alse . . . or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or

misleading consumers" and "any . . . [f]ailure to state a material fact if the failure deceives or tends to deceive." Private parties who bring a suit must establish that they "suffered an identifiable loss, measured by the amount the consumer spent or lost as a result of his or her reliance on the sellers' misrepresentation." *Green v. Wells Fargo Bank, N.A.*, Civ. Action No. DKC 12-1040, 2014 WL 360087, at *3 n.3 (D.Md. Jan. 31, 2014). Plaintiff's claim alleging violations of the MCPA is also subject to the heightened pleading standard of Rule 9(b). *See Green*, 2014 WL 360087, at *2; *Dwoskin v. Bank of Am., N.A.*, 850 F.Supp.2d 557, 569 (D.Md. 2012).

King Buick GMC makes three arguments to contest Plaintiff's ability to plead an MCPA claim: (1) King Buick GMC did not make any false statement; (2) there was no justifiable reliance; and (3) Plaintiff fails to meet MCPA's "actual injury" requirement. The first two arguments have already been addressed and rejected in the context of the negligent misrepresentation and fraud claims, and the same logic applies here. As for the third argument, King Buick GMC argues that Plaintiff has not alleged that she sold her vehicle and suffered any actual injury or loss. King Buick GMC further avers that Plaintiff has not alleged that she has "spent a dime on any repair or has been unable to use [her] vehicle at any time over the past 2½-3 years." (ECF No. 36-1, at 35). Plaintiff asserts that as a

result of the misrepresentations regarding the vehicle's prior short-term rental use, she suffered injury because she was overcharged and paid significantly more for the vehicle than it was worth. (ECF No. 22 ¶ 180). The amended complaint further states that Plaintiff was denied the opportunity to decline to purchase vehicles known to have been used previously for short-term rentals. (*Id.* ¶ 129). In the opposition, Plaintiff asserts that "Ms. Chambers [] suffered an actual economic loss at the time [she] paid for [her] vehicle[]," because she paid more for the vehicle than it was worth (*i.e.,* she was overcharged). (ECF No. 48, at 103).

Plaintiff has not adequately pled injury with respect to the MCPA violation. "[I]n order to articulate a cognizable injury under the [MCPA], the injury must be objectively identifiable." *Lloyd*, 397 Md. at 143. A complaint adequately pleads loss, for instance, when it points to some amount that it would "take to remedy the loss [the plaintiff] incurred as a result of the respondents' alleged deceptive trade practices." *Id.* at 150. *Jones*, 752 F.Supp.2d at 684, is directly on point. As discussed *supra*, the plaintiff in *Jones* also alleged that defendant violated the MCPA by failing to disclose that the 2007 Pontiac G6 was previously used as a short-term rental. The undersigned concluded that the complaint in that case did not point to any "cost of remedy" or any other actual harm with

respect to defendant's alleged concealment of the car's prior use as a rental car. Plaintiff in *Jones* merely stated that she would not have purchased the car or "would have demanded significant price concessions." Here too, Plaintiff asserts that she paid significantly more for the vehicle than it was worth and was thus overcharged, allegations similar to those in *Jones*. In dismissing the MCPA claim in *Jones*, the undersigned reasoned that "[a] hypothetical price concession is simply not the type of tangible injury appropriately recognized in a private MCPA action, as virtually any misrepresentation could support such a claim of 'injury.'" In *Jones* – much like here – plaintiff did not allege that she incurred additional repair costs because of the car's prior use. *Cf. Barry v. EMC Mortg. Corp.*, No. DKC 10-3120, 2012 WL 3595153, at *8 (D.Md. Aug. 17, 2012) (plaintiff sufficiently pled damages under the MCPA when he incurred penalties, lost credit opportunities, and emotional distress as a result of the defendant's MCPA violations); *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 149 (2007) ("it is clear that the petitioners have alleged facts constituting a loss [under the MCPA]. Particularly, the petitioners allege that, as a result of the respondents' misrepresentation or omission, they suffered a loss, measured by the amount it will cost them to repair the defective seatbacks.").

99

Plaintiff argues in the opposition that she suffered an actual economic loss on the date of the transaction because she was overcharged for the vehicle and paid significantly more for her vehicle.  Plaintiff specifies in the opposition that she does *not* assert that she suffered damages on the basis of "a diminished post-sale value of the vehicles, lost profits, or any other speculative future loss."  (*Id.*); *Jones*, 752 F.Supp.2d at 684 ("[n]or does [plaintiff] allege that the concealed fact caused any diminution in the value of the car.").   The allegations here mirror those in *Jones* with respect to the MCPA claim, warranting dismissal.   Accordingly, the MCPA claim against King Buick GMC will be dismissed.[15]

## I.   Breach of Contract (Count VII)

Plaintiff asserts that King Buick GMC's failure to disclose the prior short-term rental use of the 2010 Dodge Caliber in the Buyer's Order constituted a breach of contract.  "To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and

---

[15] Plaintiff submitted a Rule 56(d) Affidavit with its opposition.   Rule 56(d) allows the court to deny summary judgment or delay ruling on the motion until discovery has occurred if the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."  Fed.R.Civ.P. 56(d).  Here, only the Other Dealer Defendants moved for summary judgment on Counts I through VII.   King Buick GMC moved to dismiss.   Because the motion filed by the Other Dealer Defendants will be granted on standing grounds, Plaintiff's Rule 56(d) request will be denied as moot.

that the defendant breached that obligation." *Carroll Co. v.
Sherwin-Williams Co.*, 848 F.Supp.2d 557, 563 (D.Md. 2012).  King
Buick GMC argues that the breach of contract claim should be
dismissed.  It contends that Plaintiff fails to identify any
term in the sales contract which King Buick GMC failed to
perform and how it breached any contractual term.  Plaintiff
counters that King Buick GMC breached the contract by expressly
representing on Ms. Chambers's contract that her vehicle had no
prior short-term rental use.  "As a result, regardless of
whether or not King Buick was required to address the prior
short-term rental use of Ms. Chambers's vehicle of her Buyer's
Order, it did so, thereby making prior use of the vehicle a
material term of the contract."  (ECF No. 48, at 104).  Thus,
Plaintiff concludes that "[w]hen King Buick delivered to Ms.
Chambers a vehicle previously used for short-term rentals, it
breached its contract by failing to sell her the vehicle
promised – a vehicle which comported with the contract
description." (ECF No. 48, at 104).

The breach of contract claim will be dismissed.  As noted
in *RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 655
(2010), "[i]t is well-established in Maryland that a complaint
alleging a breach of contract 'must of necessity allege with
certainty and definiteness *facts* showing a contractual
obligation owed by the defendant to the plaintiff and a breach

of that obligation by defendant.'" (quoting *Continental Masonry Co., Inc. v. Verdel Constr. Co., Inc.*, 279 Md. 476, 480 (1977)) (emphasis in original). Moreover, in considering the sufficiency of a complaint alleging breach of contract, "any ambiguity or uncertainty in the allegations is to be construed against the pleader." *RRC Northeast*, 413 Md. at 655. Here, Plaintiff does not identify which contract provision Defendant purportedly breached. Instead, Plaintiff posits that the failure to identify the vehicle as a short-term rental constituted a material breach of the contract. In the opposition, Plaintiff cites no case-law to support this claim against King Buick GMC, namely that an omission on this sort in a contract can constitute a breach. The amended complaint states that King Buick GMC materially breached the contract by failing to sell the vehicle promised and selling a used vehicle that failed to comport with the description of the vehicle. The vehicle promised was a 2010 Dodge Caliber, which is what Plaintiff received. Moreover, as King Buick GMC points out, "[t]he sales contract[] expressly state[d] the material terms agreed to by the parties including the make, model and year of the vehicles purchased, the sales price and the amount of all of the taxes, charges, etc. to be paid." (ECF No. 36-1, at 36). Plaintiff has not explained how failure to identify in the Buyer's Order that the 2010 Dodge Caliber was a prior short-term

rental constituted a material breach of King Buick GMC's obligation. King Buick GMC avers that Plaintiff has not alleged that the vehicle failed to operate properly or as indicated in the Buyer's Order. The fact that the Buyer's Order contained a space for the rental use disclosure does not necessarily make prior rental use a material term, and Plaintiff has pointed to no authority to suggest otherwise. Plaintiff's claim sounds in tort, not in contract. Moreover, the single assertion in the amended complaint that King Buick GMC did not exercise good faith in performing its contractual obligation is conclusory and insufficient for Plaintiff to satisfy its pleading burden on the breach of contract claim. *See, e.g., Barry*, 2011 WL 2669436, at *7 ("Count III does not identify EMC's obligations under the Deed of Trust or state when or how these obligations were breached. The vague assertion that EMC's conduct 'was in bad faith' is not sufficient."). Accordingly, the breach of contract claim will be dismissed.

### J. Money Had and Received/Unjust Enrichment (Count V)

Plaintiff alleges an unjust enrichment claim, stemming from King Buick GMC's collection of payment for Plaintiff's vehicle "in amounts that exceeded the represented value of the[] vehicles." (ECF No. 22 ¶ 185). Plaintiff asserts that by doing so, King Buick GMC came into possession of money to which it had no right.

In its motion to dismiss, King Buick includes a paragraph arguing that the unjust enrichment claim should be dismissed because there is an express contract governing this action. (ECF No. 36-1, at 37). "In Maryland, a claim of unjust enrichment, which is a quasi-contract claim, may not be brought where the subject matter of the claim is covered by an express contract between the parties." *Janusz v. Gilliam*, 404 Md. 524, 537 (2008) (quotation marks omitted); *see also FLF, Inc. v. World Publ'ns, Inc.*, 999 F.Supp. 640, 642 (1998) ("It is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties."). "Generally, courts are hesitant to deviate from the principle of the rule and allow unjust enrichment claims only when there is evidence of fraud or bad faith, there has been a breach of contract or a mutual rescission of the contract, when rescission is warranted, or when the express contract does not fully address a subject matter." *Cnty. Com'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 101 (2000).

Here, the amended complaint alleges fraud. Moreover, the Federal Rules of Civil Procedure allow parties to plead claims in the alternative. *See* Fed.R.Civ.P. 8(e)(2) ("A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal [or]

equitable grounds."). King Buick GMC has not argued that Plaintiff failed to state a claim for unjust enrichment. Thus, dismissing the unjust enrichment claims now would be premature. *See, e.g., RaceRedi Motorsports, LLC v. Dart Mach.*, Ltd., 640 F.Supp.2d 660, 666 (D.Md. 2009) (declining to dismiss unjust enrichment claim pled in the alternative where contract terms remained in dispute).

### K. Plaintiff's Motion for Leave to File Surreply and Supplemental Rule 56(d) Declaration

Plaintiff moved for leave to file a surreply and to file a supplemental Rule 56(d) Declaration. (ECF No. 68). "Unless otherwise ordered by the Court, surreply memoranda are not permitted to be filed." Local Rule 105.2(a). Although a district court has discretion to allow a surreply, surreplies are generally disfavored. *Chubb & Son v. C.C. Complete Servs., LLC*, 919 F.Supp.2d 666, 679 (D.Md. 2013). A surreply may be permitted "when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply." *Khoury v. Meserve*, 268 F.Supp.2d 600, 605 (D.Md. 2003) (citation omitted). By contrast, "[a] motion for leave to file a surreply may be denied when the matter addressed in the reply is not new." *Marshall v. Capital View Mut. Homes*, No. RWT-12-3109, 2013 WL 3353752, at *3 (D.Md. July 2, 2013).

Here, to support her request, Plaintiff objects to the arguments made in the Other Dealer Defendants' motion to dismiss or for summary judgment regarding King Buick GMC's inspection of its sales files and arguments made regarding the percentage of rental vehicles sold in the last three years and the disclosures made. (*See* ECF No. 55-6). The Other Dealer Defendants also submitted as exhibits to their motion to dismiss or for summary judgment, redacted versions of customer files purporting to show that disclosures regarding prior rental use were made. Plaintiff objects to these filings and argues that "[t]he King Defendants' Replies raise, for the first time, the subject of an allegedly 'comprehensive review and inspection of its sales files involving the prior rentals sold to consumers.'" (*Id.* at 6). Plaintiff asserts that "without discovery from these customers, including a review of the disclosures, representations and/or concealments *on their buyer's orders*, Plaintiff[] [is] unable to document whether the disclosures made to these customers had a tendency or capacity to mislead or deceive these customers in violations of the Maryland Consumer Protection Act." (ECF No. 68, at 5). Plaintiff argues that "[s]hould these buyer's orders contain a misrepresentation or concealment of the prior short-term rental use of the vehicles sold . . . any subsequent purported 'disclosure' of the rental history of the vehicle on a document such as a Disclosure of

Former Vehicle Use form or Carfax report given to the buyer is immaterial because the earlier misrepresentation on the buyer's order violates the CPA and a later alleged disclosure fails to cure it." (*Id.*).

There are several problems with Plaintiff's arguments. As an initial matter, the Other Dealer Defendants' motion for summary judgment only addressed the non-RICO claims, and as discussed *supra*, Plaintiff lacks standing to assert these claims against the Other Dealer Defendants.[16] Thus, the undersigned did not consider the arguments made by the Other Dealer Defendants regarding the merits of the claims in Counts I through VII as to the Other Dealer Defendants. Moreover, as evident by the analysis above, the undersigned did not consider the supplemental exhibits filed by the Other Dealer Defendants to show that King Buick GMC and Other Dealer Defendants largely made the requisite disclosures to consumers. These arguments were irrelevant at this stage for purposes of deciding the viability of each claim asserted in the amended complaint. Thus, a surreply would be wholly unnecessary and the motion will be denied.

Plaintiff's request to file a supplemental Rule 56(d) affidavit from Richard Gordon, counsel for Plaintiff in this

---

[16] King Buick GMC moved to dismiss, not for summary judgment.

matter, will also be denied. First, the Other Dealer Defendants' motion to dismiss or for summary judgment was granted on standing grounds, not on the merits of the claims against them. Thus, Plaintiff's initial Rule 56(d) request is moot. In any event, the information contained in this supplemental affidavit largely attempts to refute the statistics provided by the Other Dealer Defendants regarding the number of short-term rental vehicles sold and disclosures made to purchasers. For instance, Mr. Gordon states in the supplemental affidavit that:

> one of the more compelling reasons why Plaintiff[] require[s] discovery from Defendants before responding to Defendants' Motion for Summary Judgment is because, based on Plaintiff's investigation, it appears that Defendants have provided this Court with materially inaccurate information about the number of prior short-term rentals they have sold.

(ECF No. 68-4 ¶ 18). Plaintiff also seeks to submit declarations from three purchasers alleging that they were unaware at the time of purchase that the vehicles they were buying were prior short-term rentals. These arguments fail for the same reason that a surreply is unnecessary. The claims addressed in the motion to dismiss or for summary judgment will be dismissed against the Other Dealer Defendants for lack of standing, and, in any event, the issues raised in the supplemental affidavit are irrelevant to resolving the non-RICO

claims (which are the only claims on which the Other Dealer Defendants have moved for summary judgment). Accordingly, Plaintiff's motion will be denied.

### L.  Plaintiff's Motion to Consolidate Cases

Fed.R.Civ.P. 42 gives the court broad discretion to make decisions about how to most efficiently and economically try cases on its docket while providing justice to the parties. The rule states that the court may consolidate actions that involve a common question of law or fact. Fed.R.Civ.P. 42(a).

Plaintiff urges the undersigned to consolidate the instant lawsuit with another putative class action, *Michelle Clay et al. v. King Buick GMC LLC, et al.*, Case No. 1:14-cv-00811-DKC ("the Clay Lawsuit"), also pending before the undersigned. (*See* ECF No. 63-1). The Clay Lawsuit is a putative class action against the same dealership Defendants, alleging a fraudulent scheme among these Defendants based on their failure to disclose the prior short-term rental use of vehicles to consumers. Plaintiff asserts that the two lawsuits involve identical defendants, rely on virtually the same facts, and assert the same counts, with the exception of an additional count for express breach of warranty asserted in the Clay Lawsuit. Plaintiff further argues that the Clay Lawsuit is based on seemingly-overlapping factual and legal issues and the required document discovery from the Defendants will be virtually identical in both lawsuits. (*Id.*

at 6). Plaintiff believes that consolidating both lawsuits will generate substantial economies for the court and the parties and prevent inconsistent factual and legal determinations in the event the two actions are separately adjudicated.

All of the Defendants filed a motion opposing the request to consolidate the two actions. Although Plaintiff cited Fed.R.Civ.P. 42 as the basis for her motion to consolidate, Defendants rely on Fed.R.Civ.P. 20 – governing joinder of parties – in framing their arguments against consolidation. In any event, Defendants offer compelling arguments against consolidation.

Defendants argue that:

> Chambers seeks to indirectly amend her Complaint, which she cannot do without leave of court, by trying to improperly 'join' the individual claims of three unrelated plaintiffs[] against different defendants involving separate transactions occurring over a three year period in the Clay Lawsuit[], and then improperly joining them with Chambers' claim involving her purchase of her vehicle from King Buick GMC in the Chambers Lawsuit.

(ECF No. 65, at 4). Specifically, in the Clay Lawsuit, there are three putative Named Plaintiffs. Michelle Clay alleges that in 2010, she purchased her vehicle from Hagerstown Ford for $8,000; Veronica Blake Weinberger alleges that in 2011, she purchased her vehicle from Kia of Silver Spring for $15,034.66; and Agnita Kote alleges that in 2012, she purchased her vehicle

from King Volkswagen for $10,841.  Defendants point out that Ms.
Chambers and the three Plaintiffs in the Clay Lawsuit received
different disclosures regarding the prior short-term rental use
in each transaction with a different dealership Defendant.  For
instance, Defendants include as an exhibit to their opposition a
copy of a Disclosure of Former Vehicle Use Form from King
Hagerstown Motors to Michelle Clay, showing that the "short term
rental vehicle" box is checked, highlighted, and the form is
signed by Michelle Clay.  (ECF No. 65-1, at 2).  As Defendants
point out, "the same disclosure document was not signed by each
Plaintiff.  To the contrary, the prior rental disclosures
provided by King Buick GMC to their customers differ from those
provided by the [Other Dealer] Defendants who have different
sales contracts, disclosure documents and procedures for
properly disclosing the prior rental history to their
customers."  (ECF No. 65, at 13).  Defendants argue that
"Plaintiff['s] counsel has made the nuances between the
different types of written disclosures the cornerstone of their
claims." (*Id.* at 30).  Furthermore, Defendants state that each
Plaintiff dealt with different salespeople at each dealership.

Also compelling is Defendants' argument that the terms of
the sales agreements with each Plaintiff differ in important
respects.  For instance, Agnita Kote – a Plaintiff in the Clay
Lawsuit – executed a sales contract with King Volkswagen.  Her

contract contains a binding arbitration clause. (*See* ECF No. 65-2, at 2).   Moreover, the integration clause in Ms. Kote's Buyer's Order is different from the Buyer's Order Ms. Chambers executed with King Buick GMC.   Specifically, the integration clause in Ms. Kote's contract states that "any other documents signed by Purchaser in connection with the transaction comprise the entire and complete agreement." (*Id.*).   Furthermore, Ms. Kote's contract contains a "waiver of jury trial" provision, not included in other agreements.   The undersigned finds persuasive Defendants' argument that consolidation would "create a logistical nightmare with different plaintiffs each raising unique factual and legal issues that will have to be analyzed one at a time." (ECF No. 65, at 31).   The two lawsuits are quite obviously similar on their face, but there are important factual differences that counsel against consolidation.

Although analyzed in the context of joinder, the reasoning in *Saval v. BL Ltd.*, 710 F.2d 1027, 1031 (4th Cir. 1983), applies here.   The court noted:

> The cars were purchased at different times, were driven differently, and had different service histories.   Quite probably, severance would have been required in order to keep straight the facts pertaining to the separate automobiles.

Moreover, Plaintiff is operating under the premise that all of the claims in the instant lawsuit will survive dismissal; but

112

for the reasons explained *supra*, this is not the case. Accordingly, to consolidate the two cases where some of the claims against the Other Dealers Defendants and King Buick GMC will be dismissed here would only complicate the already involved proceedings in this action.  To the extent Plaintiff is worried that maintaining two separate actions would result in inconsistent adjudication, the fact that the two cases are both before the undersigned reduces the risk that the undersigned would decide differently identical issues in the two cases.  Of course, nuances in the law and facts in each proceeding may require different results.

Accordingly, the motion to consolidate the two actions will be denied at this time.

## IV.  Conclusion

For the foregoing reasons, the motion to dismiss the RICO claims filed by all of Defendants will be granted in part. Claims under Section 1962(a) and (d) will be dismissed.  King Buick GMC's motion to dismiss the non-RICO claims will be granted in part.  The MMWA, breach of the implied warranty of merchantability, MCPA, and breach of contract claims will be dismissed.  The Other Dealer Defendants' motion to dismiss or for summary judgment on the non-RICO claims will be granted. Plaintiff's motions to consolidate and for leave to file a surreply and a supplemental Rule 56(d) Affidavit will be denied.

Defendants' motion to strike the notices of supplemental authority will also be denied.  A separate order will follow.


                              /s/
                              DEBORAH K. CHASANOW
                              United States District Judge